# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **LISA HILL LEONARD, an individual, and LEONARD DRUGS INC. d/b/a THE DRUG STORE, an Alabama Corporation,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | Case No.: 3:21-cv-596-ECM-SMD |
| **v.** | ) ) | |
| **THE ALABAMA STATE BOARD OF PHARMACY, a state licensing board; BRENDA DENSON, CHRIS PHUNG, ROBERT COLBURN, CHRISTY K. GARMON, and GARY MOUNT, individually and in their official capacities as Members of the Alabama State Board of Pharmacy,** | ) ) ) ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) | |

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION, DECLARATORY JUDGMENT, AND OTHER ALLIED RELIEF INCLUDING TREBLE, COMPENSATORY, AND PUNITIVE DAMAGES

Plaintiffs Lisa Hill Leonard ("Lisa Leonard") and Leonard Drugs Inc. d/b/a The Drug Store ("The Drug Store")(sometimes collectively referred to as "plaintiffs") are, respectively, an individual licensed pharmacist who is the supervising pharmacist for The Drug Store and The Drug Store itself, which is a family-owned retail pharmacy in Auburn, Alabama and an Alabama corporation.

Plaintiffs bring this action against The Alabama State Board of Pharmacy (the "BoP") and the members of the Board, individually and in their official capacities (the "Board members") (sometimes the "BoP" and the "Board members" will be referred to collectively as the "Board" or as the "defendants").

### Introduction to the Illegal Actions of the Board

1.    The Board seeks to prohibit Lisa Leonard from practicing pharmacy and to close The Drug Store permanently because plaintiffs administered COVID-19 antibody tests, which pharmacists were permitted to do, during the still-ongoing pandemic. This is a civil action for preliminary and permanent injunction, a declaratory judgment, and other allied relief to prevent the defendants, including the Board members individually, and the BoP's employees and agents, from taking these actions and engaging in illegal *ultra vires* and anticompetitive activities and selective, bad faith, predatory, and retaliatory "enforcement" actions that (a) exceed the defendants' authority and jurisdiction and/or are preempted by federal law, (b) violate the antitrust laws and other prohibitions against activities that are anticompetitive, (c) violate the plaintiffs' federal constitutional rights, and (d) illegally weaponize a regulatory body by enabling and collaborating in a personal vendetta by one or more of BoP's investigators, including—specifically, Glenn Wells—against Lisa Leonard and The Drug Store.

{B4112082}                                    2

2.     The illegal actions of the Board and its agents must be enjoined. Plaintiffs also seek to recover damages, including compensatory and treble damages pursuant to 15 U.S.C. § 1 and § 15 and including compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for the harm that they have suffered, are suffering and will continue to suffer as the result of illegal actions of the defendants, including the Board members individually.

3.     The defendants chose to initiate and continue to pursue their illegal actions against Lisa Leonard and The Drug Store in the midst of a global pandemic —nominally for administering COVID-19 antibody tests.  The defendants initiated a biased, *ultra vires* investigation, and now a prosecution, even though there was not a single *legitimate* customer complaint regarding the administration of the antibody testing at The Drug Store.  The defendants are singling out Lisa Leonard with the collaboration of one or more self-serving, biased individuals who have ulterior motives for their actions, including personal vendettas against plaintiffs and the desire to eliminate plaintiffs as market competitors.

4.     Numerous other pharmacists and pharmacies in the local market served by The Drug Store and statewide have been offering and continue to offer antibody tests without having been investigated and without having to defend themselves against similar specious, *ultra vires*, and pretextual charges pursued for illegal motives.

{B4112082}

3

5.    Defendants opportunistically chose the chaos of the onset of the COVID-19 pandemic as pretext and cover for their malicious actions against plaintiffs and their employees.  As a result of plaintiffs' efforts to serve their community at a time when the entire world was seeking answers and guidance regarding COVID-19 was changing on a daily basis, defendants decided to persecute a small-town pharmacist and a family-owned pharmacy for providing a service— over which the defendants do not even have jurisdiction—sought by plaintiffs' customers and members of the local community.

6.    Failure to enjoin the defendants' transparently biased and illegal persecution of Lisa Leonard and her family's pharmacy will ***irreparably harm*** Lisa Leonard and The Drug Store, their customers, and their employees—all before the plaintiffs have an opportunity to seek meaningful independent review of any decision by the Board.  The biased and market-participant defendants will effectively be allowed to sit as investigators, judges, jury, and executioners of Lisa Leonard's livelihood as a pharmacist and her and husband Craig Leonard's career-long investment in their family business, The Drug Store, without any substantive impartial review, accountability, or recourse.

7.    The Board's overreaching and personally targeted actions present an absolute existential threat to the plaintiffs' continued existence in the practice and business of pharmacy.  The defendants' actions have also caused substantial injury,

imposed hardship, and necessitated financial loss on plaintiffs as they defend themselves against these scurrilous and unfounded charges.

8.     The defendants' actions are a matter of substantial public interest because the failure to enjoin these actions will permit, without accountability, similar unfettered and unsupervised actions by the defendants that are inequitable, unjust, illegal, harmful, and anticompetitive against *any* pharmacist and/or *any* pharmacy— offering an open invitation to the defendants for repetition and further abuse. Such conduct by the defendants must not be tolerated, and any professional or pharmacy holding a license or permit issued by the Board is at risk, going forward, if such conduct is not enjoined. *No bond or security should therefore be required for the injunctive relief sought here because the case falls squarely within the public interest exception to the bond requirement for any injunctive relief.*

9.     Plaintiffs file this action as a measure of last resort in the face of this existential threat, the defendants' obvious and thoroughgoing bias, and the defendants' illegal actions.

## Parties

10.     Plaintiff Lisa Leonard is a duly licensed Alabama pharmacist and is the supervising pharmacist of The Drug Store. Lisa Leonard resides in Lee County, Alabama and practices pharmacy in Auburn, Alabama, along with her pharmacist

husband, Craig Leonard.  Lisa Leonard has been a pharmacist since 1989—for nearly 32 years.

11.   Craig Leonard, who is a pharmacist with 38 years of experience, opened The Drug Store in 1985.  After they married in 1989, Craig and Lisa Leonard began to operate The Drug Store jointly.  Leonard Drugs, Inc. d/b/a The Drug Store is a retail pharmaceutical business formed on February 1, 2001, organized under the laws of the State of Alabama, having its principal place of business in Auburn, Alabama. Prior to the formation of Leonard Drugs, Inc., The Drug Store operated under a different corporate name.  The Drug Store employs three pharmacists (two full-time and one part-time), three pharmacy technicians, an office manager, two students, and one delivery person.

12.   BoP, a non-sovereign entity, consists of "five members who are citizens of Alabama."  Ala. Code § 34-23-90(a).  The members of the Board are "licensed pharmacists who have been licensed in Alabama for a minimum of five years and who are *actively engaged in the practice of pharmacy or pharmacy administration, or both*."  Ala. Code § 34-23-90(a)(emphasis added).  The Board's principal place of business is located at 111 Village Street, Hoover, Shelby County, Alabama 35242. The Board's authority is limited to regulating the practice of pharmacy in the State of Alabama as prescribed by law—specifically relevant here are Ala. Code § 34-23-1 and § 34-23-90 through § 34-23-92.1.  The Board has no authority over activities

that do not fall within its statutory scope and has no exemption from the requirements of law, including its own statutes, from the federal antitrust laws, the federal constitution, or any other law.   The BoP's *ultra vires*, anticompetitive, and unconstitutional actions are not protected by sovereign immunity.

13.    Defendant Brenda Denson ("Denson") is the President of the Board. Denson practices pharmacy in Birmingham, Alabama and is understood to be a citizen of Alabama.  Plaintiffs' federal claims against Denson in her official and individual capacity are not barred by sovereign immunity.

14.    Defendant Chris Phung ("Phung") is the Vice President of the Board. Phung practices pharmacy in Montgomery, Alabama and is understood to be a citizen of Alabama.  Plaintiffs' federal claims against Phung in his official and individual capacity are not barred by sovereign immunity.

15.    Defendant Robert Colburn ("Colburn") is the Treasurer of the Board. Colburn practices pharmacy in Northport, Alabama and is understood to be a citizen of Alabama.  Plaintiffs' federal claims against Colburn in his official and individual capacity are not barred by sovereign immunity.

16.    Defendant Christy K. Garmon ("Garmon") is a member of the Board. Garmon works for chain pharmacy CVS in South Alabama and in Mississippi[1] and

---

[1] https://www.samford.edu/pharmacy/news/2020/Pharmacy-Alumna-Christy-Garmon-Joins-Alabama-State-Board-of-Pharmacy

is understood to be a citizen of Alabama. Plaintiffs' federal claims against Garmon in her official and individual capacity are not barred by sovereign immunity.

17.    Defendant Gary Mount ("Mount") is a member of the Board. Mount is employed by the Edward Via College of Osteopathic Medicine (at its Auburn, Alabama campus, it is presumed) and is understood to be a citizen of Alabama. Plaintiffs' federal claims against Mount in his official and individual capacity are not barred by sovereign immunity.

### Jurisdiction

18.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides that "the district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve a federal question presented by a plaintiff who seeks injunctive relief from state regulation, on grounds that such regulation is preempted by federal law. *See Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1261 (11th Cir. 2012)(citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 92 n.14 (1983)).

19.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because plaintiffs are asserting claims under the federal antitrust laws.

{B4112082}                                          8

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343 because plaintiffs are asserting claims under the Constitution and laws of the United States, including pursuant to 42 U.S.C. § 1983, to redress the deprivation, under color of State law, statute, ordinance, regulation, customer or usage, of their rights, privileges or immunity secured by the Constitution of the United States.     Orders of state administrative agencies and licensing boards constitute "state action" for purposes of 42 U.S.C. § 1983.

21.     The Board was created by the Alabama legislature with limited authority, powers, and duties. *See* Ala. Code §§ 34-23-90 *et seq*.  The Board conducts activities throughout the State of Alabama and the events and activities giving rise to the claims asserted in this suit occurred in the State of Alabama— primarily and substantively in Lee County.  Lee County, Alabama is where the Board's actions will have effect in addition to their effect on interstate commerce. The Court has jurisdiction over the Board.  Defendants Denson, Phung, Colburn, Garmon, and Mount are all citizens of the State of Alabama.   Therefore, all defendants are subject to personal jurisdiction in Alabama.

## Venue

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22, which supplements, rather than supersedes, section 1391.

23.     The defendants' illegal actions, including, but not limited to, their *ultra vires* actions, substantially and adversely affect interstate commerce in the relevant market.  The Board members and the plaintiffs all provide services affecting and/or in interstate commerce, and the Board members and the plaintiffs practice pharmacy as market participants using or selling products that are sold and/or shipped across state lines.   In addition, the Board members' actions threaten to illegally restrain competition in the relevant market.  The Board members' actions, therefore, have the effect of reducing the amount of interstate and intrastate commerce and competition to the detriment of consumers.

## Unavailability of Administrative Remedy: Exhaustion is Not Required, Nor is Abstention

24.     The substantial harm to plaintiffs cannot be remedied after the exhaustion of any administrative review because of the defendants' vehement, unyielding, and transparent bias and as exhibited by their illegal actions including their abuse of the administrative process and their motive, means, and opportunity to terminate plaintiffs' professional and business existence.  Plaintiffs will be irreparably harmed in their profession and business, respectively, with corresponding harm to their customers, employees, and family members before they have the opportunity to defend themselves in an unbiased forum offering *active* supervision of the administrative decisions of these market participants.  Post hoc judicial review on a limited administrative record controlled by the defendants and

{B4112082}                                          10

litigated in the Board's own forum does not allow for due process. The Board and its market-participant Board members will be sitting as investigating body, judge, jury, and sentencing authority on a highly selective and limited administrative record—virtually ensuring that the Board's adverse decisions will be sustained on any state court appeal and defeating any real opportunity for the plaintiffs to obtain due process. In addition, the Court must not abstain in this case because the specific factual allegations herein regarding the actions of the market participant defendants, their investigators, and their third-party market-participant collaborator(s) conclusively establish the existence of the "bad faith" and "extraordinary circumstances" exceptions in light of the existential threats posed to plaintiffs and to their federal constitutional rights.

25.    Administrative remedies need not be sought if they are inadequate or are applied in a manner as in effect deny a person's rights under 42 U.S.C. § 1983, nor is exhaustion of state judicial remedies a prerequisite. The federal court has the obligation to address constitutional issues to preserve rights. *See Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 561 (1982)(exhaustion of state administrative remedies is not a prerequisite).

26.    The *Rooker-Feldman* doctrine does not bar the plaintiffs' constitutional claims under § 1983 because plaintiffs' claims do not seek review or reversal on

appeal of a state court action and instead are directed to the *ultra vires*, illegal, anticompetitive, and unconstitutional actions of the Board and its agents.

27.    *Younger* abstention is also inappropriate because the Board's actions do not underlie a criminal prosecution, and federal, not state, issues predominate. Plaintiffs will not have an adequate opportunity to litigate their antitrust and constitutional claims in the state administrative proceeding, and their license and permit, respectively, are subject to suspension or revocation before they will have the opportunity to have their claims considered. *Adibi v. California State Bd of Pharmacy*, 393 F. Supp.2d 999, 1009 (N.D. Cal. 2005); *see Gibson v. Berryhill*, 411 U.S. 564, 574-579 (1973)(affirming the district court's conclusions that the Alabama "State Board of Optometry was so biased by prejudgment and pecuniary interest that it could not constitutionally conduct hearings looking toward the revocation of [plaintiffs'] licenses to practice optometry" and reaffirming "that state administrative remedies need not be exhausted where the federal court plaintiff states an otherwise good cause of action under 42 U.S.C. § 1983").

28.    In cases such as this, there is a long-established presumption of review in factual circumstances warranting judicial intervention for the protection of fundamental rights and for the prevention of abuse of authority.

## Factual Basis for the Relief Sought by Plaintiffs

**A.**   **Lisa and Craig Leonard and The Drug Store, Their Family Pharmacy.**

29.   Lisa Leonard received her Alabama pharmacy license in September 1989 after attending Auburn University's School of Pharmacy.   Lisa Leonard married Craig Leonard shortly after her graduation from pharmacy school at Auburn and began working as a pharmacist at The Drug Store, a pharmacy that Craig Leonard opened several years before meeting Lisa Leonard.  Lisa Leonard has been a pharmacist at The Drug Store ever since.

30.   Edward Craig Leonard ("Craig Leonard") received his Alabama pharmacy license in January 1983 after attending Auburn University's School of Pharmacy.  Since 1985, The Drug Store has been serving customers—many of long-stand relationships—as a family pharmacy.

31.   The Drug Store employs eight employees: one part-time pharmacist, three pharmacy technicians (two part-time and one full-time), two part-time office support employees (Lisa's mother and father), and two pharmacy students (these students typically change from semester to semester).  Fred Brent Wilson ("Brent Wilson"), a full-time pharmacy technician, has been working at The Drug Store for 32 years.  (Brent Wilson's wife died from COVID-19 just days before the Board demanded a meeting with Lisa Leonard in September 2020.)  Jane Fisher, a part-time pharmacist, has worked at The Drug Store for more than 15 years. Lisa

Leonard's parents, Katherine and Phil Hill, have worked at The Drug Store for the past twenty years (sometimes as full-time employees and currently as part-time employees), assisting with everything from bookkeeping to running errands to making deliveries.

32.    The Drug Store's customers are mostly local, non-student residents, including many elderly customers. The Drug Store is known for customer service, long-term employees, and drug compounding. Drug compounding is the combination or mixing of drug ingredients by a pharmacist to make a tailor-made compound drug for an individual patient. The U.S. Food and Drug Administration ("FDA") has recognized this practice can serve "an important medical need" for patients, and, indeed, The Drug Store has many customers who rely upon compounding. The Drug Store serves unique community needs. Lisa and Craig Leonard take a personal approach to customer service, offer deliveries, and have charge accounts for some customers of long-standing. They also have regularly volunteered in their community, provided flu clinics, and sponsored little league teams.

**B.     The 2020 COVID-19 Pandemic Emergency in the United States.**

33.    The Centers for Disease Control and Prevention (the "CDC") is an operating division of the United States Department of Health and Human Services ("HHS") "and is recognized as the nation's premiere health promotion, prevention,

and preparedness agency."[2]  The CDC's mission is "to protect America from health, safety and security threats, both foreign and in the United States.[3]

34.    In December 2019, the life-threatening disease now known as coronavirus disease 2019, abbreviated "COVID-19," was first discovered. [4]

35.    The CDC confirmed the first travel-related case of COVID-19 in the United States on January 21, 2020[5] and the second travel-related case on January 24, 2020.[6]  On January 30, 2020, the CDC confirmed the first instance of person-to-person spread of COVID-19 in the United States.[7]

36.    On January 31, 2020, Alex Azar, Secretary of HHS, declared a public health emergency for the entire United States "to aid the nation's healthcare community in responding to [COVID-19]."

37.    On February 29, 2020, the FDA released a policy to help expedite the availability of COVID-19 tests.  The FDA recognized that an effective response to the COVID-19 outbreak "can best be achieved with wide availability of testing capabilities in health care settings, reference and commercial laboratories, and at the point of care," stating that "[r]apid detection of COVID-19 cases in the U.S. requires

---

[2] https://www.cdc.gov/about/history/index.html
[3] https://www.cdc.gov/about/organization/mission.htm
[4] The World Health Organization announced an official name for the virus on February 11, 2020. *See* https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html
[5] https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html
[6] https://www.cdc.gov/media/releases/2020/p0124-second-travel-coronavirus.html
[7] https://www.cdc.gov/media/releases/2020/p0130-coronavirus-spread.html

wide availability of diagnostic testing to control the emergency of a rapidly spreading, severe illness."[8] Having found that circumstances existed which justified the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of the COVID-19 outbreak, the FDA granted laboratories the right to immediately use validated COVID-19 diagnostics without an Emergency Use Authorization ("EUA").[9] The FDA included antibody testing in this policy stating "[c]onsidering that serology tests are less complex than molecular tests and are solely used to identify antibodies to the virus, FDA does not intend to object to the development and distribution by commercial manufacturers or development and use by laboratories of serology tests to identify antibodies" to COVID-19 "without an EUA."

38.    On March 10, 2020, then-HHS Secretary, Alex M. Azar II, issued a declaration under the Public Readiness and Emergency Preparedness Act ("PREP Act") providing (retroactively to February 4, 2020) liability immunity to certain individuals and entities (covered persons) against claims of loss caused by, arising out of, relating to, or resulting from COVID-19 covered countermeasures.

---

[8] https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issues-new-policy-help-expedite-availability-diagnostics
[9] https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issues-new-policy-help-expedite-availability-diagnostics

39.    The PREP Act includes a preemption provision stating "[d]uring the effective period of a declaration…no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—(A) is different from, or is in conflict with" the terms of the Declaration; and "(B) relates to the…administration by qualified persons of the covered countermeasure[.]"[10]

40.    Since the original declaration, HHS has amended and expanded the declaration a number of times to clarify who and what is covered for COVID-19 pandemic. Both antibody testing (also known as serology testing) and pharmacy technicians are explicitly provided PREP Act immunity retroactive to February 4, 2020 and that immunity preempts both state law and state law licensing requirements.

41.    On March 13, 2020, Governor Kay Ivey declared a state public health emergency in Alabama due to COVID-19. *See* Exhibit 1.

42.    On March 17, 2020, the HHS Secretary issued a Declaration (effective retroactive to February 4, 2020) under the PREP Act for Medical Countermeasures Against COVID-19 to provide liability immunity to certain individuals and entities ("Covered Persons") against any claim of loss caused by, arising out of, relating to, or resulting from the manufacture, distribution, administration, or use of medical

---

[10] 42 U.S.C. § 247d-6d.

countermeasures ("Covered Countermeasures"), except for claims involving "willful misconduct." *See* 42 U.S.C. § 247d-6d. *See also* Exhibit 2.

43.    The PREP Act defines Covered Persons as those that manufacture, distribute, administer, prescribe, or use Covered Countermeasures. The March 17, 2020 (*see* Exhibit 2) Declaration notes that a retail pharmacy is a distributor. The PREP Act defines a Covered Countermeasure as any "antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19...The Declaration was effective as of February 4, 2020."

44.    In early April 2020, Lisa Leonard began receiving daily marketing emails from manufacturers of antibody tests. For example, on April 14, 2020, The Drug Store received an email from Physician 360 marketing its companies' antibody test. *See* Exhibit 3. Lisa Leonard became interested in the test because there was substantial uncertainty about COVID-19 in her community, and she thought she could help by offering customers the ability to determine if they had previously and unknowingly been exposed to the virus and had developed antibodies.

45.    The Physician 360 marketing materials touted antibody testing as a way to indicate if a person "has been exposed to and developed antibodies against the virus...from a finger stick, similar to when a Diabetic checks their blood sugar." *See* Exhibit 4. Physician 360 stated serological testing would be helpful in "risk

stratification for returning to work and supporting containment efforts to slow the spread of the virus." Other Alabama pharmacies used the Physicians 360 test as well. Adams Pharmacy, less than a block from East Alabama Medical Center in Opelika, continues to be listed on Physicians 360's website as a seller of its products, including antibody test kits.[11]

46.     After reviewing the Physicians 360 materials, Lisa Leonard decided that serology testing would be helpful for her family, employees, and community, so she ordered tests for her pharmacy. Lisa Leonard initially purchased antibody tests "because my daughters work in three hospitals [and] their employers were not testing at that time." She also wanted to test her employees for antibodies because they were being potentially exposed on a daily basis. CMS issued The Drug Store a CLIA Certificate of Waiver, enabling The Drug Store to operate as a CLIA-certified laboratory in 2019. The Drug Store's CLIA number is 01D2168950. Three federal agencies are responsible for CLIA: the FDA, CMS, and the CDC.[12]

47.     Lisa Leonard began offering the Physician 360 serology tests on April 14, 2020. The Drug Store did not bill third-parties for the test.

---

[11] https://physician360.com/where-to-buy/ (searching zip code 36801), last accessed September 7, 2021.
[12] https://www.fda.gov/medical-devices/ivd-regulatory-assistance/clinical-laboratory-improvement-amendments-clia.

{B4112082}                                    19

48.     On April 8, 2020, HHS issued guidance authorizing licensed pharmacists, "as trusted healthcare professionals with established relationships with their patients" to "order and administer COVID-19 tests, including serology tests, that the Food and Drug Administration (FDA) has authorized."[13]

49.     In additional guidance issued on April 17, 2020, HHS clarified that serology tests constituted "covered countermeasures under the declaration" and confirmed "pharmacists are covered persons" and specifically "they are qualified persons" afforded the PREP Act's "broad" immunity.[14] *See* Exhibit 5.

50.     On April 16, 2020, Lisa Leonard, on behalf of The Drug Store, decided to purchase "COVID 19 Emergency Use Test Kits" from Physician 360. In explaining the Coronavirus Rapid Test, the Physician 360 website states:

> Physician 360 is using CoronaChek™ to aid in the diagnosis of novel coronavirus SARS-CoV-2 (COVID19). This test is a rapid serology test. It detects IgM and IgG antibodies against SARS-CoV-2 in the blood, which may indicate that a person has been exposed to and developed antibodies against the virus. This blood test analyzes a small blood sample, from a finger stick, similar to when a Diabetic checks their blood sugar. In the blood, the test looks for antibodies to SARS-CoV-02. Because the test checks for antibodies, it may also confirm that your body produced antibodies in response to vaccine administration.

---

[13] Guidance for Licensed Pharmacists, COVID-19 Testing, and Immunity under the PREP Act, HHS, issued April 8, 2020, *available at*: https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/authorizing-licensed-pharmacists-to-order-and-administer-covid-19-tests.pdf.

[14] Advisory Opinion on the Public Readiness and Emergency Preparedness Act and The March 10, 2020 Declaration Under the Act, HHS Guidance, issued April 17, 2020 and modified on May 19, 2020, *available at*: https://www.hhs.gov/sites/default/files/prep-act-advisory-opinion-hhs-ogc.pdf.

*See* https://physician360.co/covid-19-pharmacy-rapid-test/

51.    On April 17, 2020 (and as later modified May 19, 2020), HHS's Office of General Counsel ("OGC") released an advisory opinion on the PREP Act specifying that PREP Act immunity may extend beyond actual "qualified persons" and approved "countermeasures," even though not technically covered by the PREP Act, if one could have reasonably believed the person or countermeasure were covered. *See* Exhibit 5.

52.    On April 17, 2020, the BoP released a document which addresses COVID-19 testing and states, "[p]harmacists may now take part in COVID-19 testing that involves the use of point-of-care tests that have an EUA approved by the FDA. As of April 16, 2020, none of the serology tests approved by the FDA are considered point-of-care tests." *See* Exhibit 6. The BoP further stated that "[o]nly pharmacists, and pharmacist interns…can perform the allowed tests….Pharmacy technicians can only be involved in completing required paperwork[.]" The Board's statement does not have the force and effect of law, is outside of the Board's jurisdiction, and is preempted by the PREP Act.

53.    On April 20, 2020, The Drug Store first administered the Physician 360 test to customers.

54.    On April 27, 2020, a reporter for WTVM requested an interview with Lisa Leonard because of The Drug Store's efforts to serve the community through

testing for antibodies using the Physician 360 test.  Lisa Leonard explained that the antibody test "tests for both antibodies" including IgM and IgG antibodies.  *See* Exhibit 7.

55.    On April 29, 2020, East Alabama Medical Center ("EAMC") began offering antibody tests.  *See* Exhibit 8.

56.    On May 4, 2020, the FDA issued new guidance "to help accelerate the availability of [COVID-19] tests developed by laboratories and commercial manufacturers for the duration of the public health emergency."  The FDA stated:

> *Rapid detection of COVID-19 cases* in the United States *requires wide availability of testing to control the emergence of this rapidly spreading, severe illness.*  This guidance describes a policy for laboratories and commercial manufacturers to help accelerate the use of tests they develop in order to achieve more rapid and widespread testing capacity in the United States.

Regarding serology tests in particular, the FDA stated that its previous policy had "succeeded in encouraging development of serology tests" but antibody test makers would now be required to seek FDA emergency authorization.  The FDA stated it would not object to the distribution of serology tests "while the manufacturer is preparing its EUA request."  *See* Exhibit 9 (emphasis added).

57.    On May 11, 2020, The Drug Store began using the Confirm BioSciences antibody test, manufactured by Healgen Scientific,[15] because it did not come burdened with the cost of an unnecessary telemedicine component, and, thus, the Confirm BioSciences test could be provided to customers at a substantially lower cost.

58.    On May 19, 2020, the HHS Office of General Counsel issued Advisory Opinion 20-02 after receiving requests "from pharmacists, pharmacies, and one trade association asking…whether the [PREP] Act preempts state licensing laws that restrict the ability of pharmacists to order and administer COVID-19 diagnostic tests where the [HHS] has expressly authorized pharmacists, under the PREP act, to order and administer those tests."  The OGC concluded that the PREP Act, in conjunction with the HHS Secretary's March 10, 2020 declaration, "preempts any state or local requirement that prohibits or effectively prohibits a pharmacist from ordering and administering a COVID-19 diagnostic test that the [FDA] has authorized."  *See* Exhibit 10.

59.    On May 29, 2020, the FDA issued an EUA to Healgen Scientific for its COVID-19 IgG/IgM Rapid Test Cassette. *See* Exhibit 11.

---

[15] https://www.prnewswire.com/news-releases/covid-19-antibody-test-offered-by-confirm-biosciences-gets-high-marks-for-accuracy-and-quality-in-national-institutes-of-health-research-301074338.html

60.    On or around June 14, 2020, a Board of Pharmacy investigator, Sean Malloy, appeared at The Drug Store unannounced and told Lisa Leonard that the Board had received a patient complaint regarding privacy practices at The Drug Store during antibody testing.  According to the BoP's own website, Malloy was not, and is not, assigned to Lee County.[16]  No citation was issued.

61.    On July 20, 2020, the Alabama Department of Public Health addressed rumors and misinformation about COVID-19 in a series of social media posts.[17]  In an article published on www.al.com, it was noted the ADPH "does not recommend antibody testing for diagnosis of COVID-19 because of accuracy and interpretation of such tests.  Antibody tests are not authorized by the FDA for diagnostic purposes in COVID-19 and some antibody tests have been removed from the market due to inaccuracy."

62.    Testing was initiated, for the vast majority of the tests at The Drug Store, by the customer completing an information form bearing a disclaimer—in bold, italicized type—that stated as follows:

> This test has not been reviewed by the FDA.  Negative results do not rule out SARS-CoV-2 infection, particularly in those who have been in contact with the virus.  Follow-up testing with a molecular diagnosis should be considered to rule out infection in these individuals.  Results from antibody testing should not be used as the sole basis to

---

[16] See paragraph 72, infra.
[17] https://www.al.com/news/2020/07/coronavirus-rumors-and-hoaxes-alabama-health-officials-address-misinformation-on-testing-cases.html

diagnosis or exclude SARS-CoV-2 infection or to inform infection status.  Positive results may be due to past or present infection with non-SARS-CoV-2 coronavirus strains such as coronavirus KHU1, NL63, OC43, or 299E.

Exhibit 12.

63.    Neither Lisa Leonard nor The Drug Store purported to be giving "diagnostic tests" for COVID-19.   Consistent with the manufacturer-provided information and available guidance and the disclaimer on the test sheet, no customer was told that he or she was receiving a COVID-19 "diagnosis."  Plaintiffs regularly screened and refused to test patients if they were symptomatic and recommended that such patients obtain a diagnostic test elsewhere.

**C.**    **Competing  Pharmacist  Chuck  Beams  Begins  His  Personal Anticompetitive  Campaign Against Lisa Leonard and The Drug Store By Repeatedly Posing as a Potential Customer.**

64.    On July 24, 2020, Charles "Chuck" Beams ("Beams"), a pharmacist and market participant with EAMC (which was offering competing COVID-19 testing), who is also understood to be an aspirant to Board of Pharmacy membership, called The Drug Store and, although his name showed up on caller identification (from his work telephone number), he pretended to be a potential customer who purportedly needed an antibody test. JoAnna Taylor, a pharmacy technician, asked him several questions including about whether he had symptoms.   After some discussion, he was told to wait to take the test.

65.     On July 27, 2020, Beams called The Drug Store again—two times. He did not initially identify himself, but, again, his name showed up on the caller identification. He asked to speak with Joanna Taylor. Lisa Leonard explained that Ms. Taylor was occupied but said she could help. Beams asked some of the same questions he had asked on July 24 of Joanna Taylor and he was again told to wait to take the test. He called back a short while later. Lisa Leonard again answered the phone. Beams insisted on speaking with Joanna Taylor, but Lisa Leonard requested that Beams talk to her instead. Beams then asked to speak to Craig Leonard. They spoke briefly, and Craig Leonard told Beams he needed to speak with Lisa Leonard because he had customers waiting. Lisa Leonard then picked up the phone. Beams asked the same questions of Lisa Leonard as he had before and was given the same answers.

66.     In his final call, Beams, for the first time, identified himself as an EAMC pharmacist and stated that he had received word that the antibody test administered at The Drug Store contradicted the results of the antibody test offered at EAMC, which "was causing muddy waters." He said the EAMC test "was the word of God" and that EAMC was potentially eligible for awards and funding for their work. Beams told Lisa Leonard to stop administering antibody tests at The Drug Store and threatened her by saying that she had not heard the end of this.

67.     The next thing Beams did after his imposture was to send an email from his eamc.org email address to ADPH, the Alabama Hospital Association, and to the Board (specifically, to Donna Yeatman, Executive Secretary) with the subject line "EAMC—Help with COVID testing concerns."   Beams then proceeded with flattery, lies about Lisa Leonard and The Drug Store, more flattery, and signed off. Beams, and his employer EAMC, was a direct competitor of Lisa Leonard and The Drug Store regarding COVID-19 testing.

**D.**     **Biased BoP Investigator Glenn Wells Sees an Opportunity in Beams' Complaints or Otherwise to Resurrect His 15-Year Old Vendetta Against the Leonards and The Drug Store.**

68.     Beams was true to his threat and Lisa Leonard had not, in fact, heard the last of this.  In late July 2020, *the day after Beams called The Drug Store for the final time and emailed his "concerns" to the Board*, Board of Pharmacy investigator Glenn Wells, who had previously had direct, personal issues with Lisa Leonard and animus towards her, called Lisa Leonard regarding the antibody testing complaint from Beams, the competing pharmacist.

69.     After this call, Glenn Wells arrived, unannounced, at The Drug Store on August 26, 2020.  Glenn Wells' August 2020 visit to The Drug Store, outside his investigative territory, was not his first encounter with Lisa Leonard.  In 2005, Wells visited The Drug Store to investigate another matter.  During that investigation, Lisa Leonard and Wells had an interaction that was not directly witnessed by anyone else

and that both describe differently.  Lisa Leonard maintained that Wells pulled a gun on her.  Wells denied doing so.

### E.   CDC and ADPH Released Further Guidance About COVID-19.

70.   On August 1, 2020, the CDC released its further guidelines on antibody testing, including guidance that serology testing may be used as a method to support diagnosis of acute COVID-19 illness for persons who present late.  *See* Exhibit 13.

71.   On August 20, 2020, the ADPH released "clarification and guidance about COVID-19."  *See* Exhibit 14.  The guidance states that "[s]erology (antibody) tests are not diagnostic tests.  These tests detect antibodies in the blood indicating possible prior exposure to COVID-19 which may develop 6-14 days after infection. Commercially available antibody tests have variable performance."  *See* Exhibit 14.

### F.   The Board Attacks Lisa Leonard and The Drug Store and Expands the Attack to The Drug Store's Employees.

72.   On August 26, 2020, Board of Pharmacy investigators Malloy and Wells appeared at The Drug Store unannounced.  Investigator Wells' duties, like Malloy's, did not include covering Lee County, according to the BoP website as it was constituted as recently as April 5, 2021.  (The Board has since changed its website to cover its tracks, but the prior version of the website may still be found at the Internet Archive.[18])  Wells asserted that the tests administered by The Drug Store

---

[18] https://web.archive.org/web/20210405133218/http://www.albop.com/Board_Staff.aspx.

were inaccurate on the same grounds as Beams and more likely than not simply adopted Beams' complaint on its face. Wells gave Lisa Leonard copies of CDC and other guidance on serology tests. Lisa Leonard believed that the tests at her pharmacy were being administered consistent with these authorities. Neither Wells nor Malloy told her to stop giving the tests.

73.    On September 2, 2020, Lisa Leonard, JoAnna Taylor, and Jane Fisher met with the BoP accompanied by a lawyer who was subsequently discharged. (On September 1, 2020, Brent Wilson's wife had died and Lisa Leonard and the employees of The Drug Store were upset, but the Board refused to reschedule the meeting even though that request was made.)

74.    On September 4, 2020, The Drug Store stopped administering all antibody tests.

75.    Lisa Leonard and The Drug Store has done whatever was asked of them and whatever they could think of to serve their customers' interests. They have also complied to the best of their ability and knowledge with all laws and regulations.

76.    During the first summer height of the COVID-19 pandemic, Lisa Leonard countered shortages of hand sanitizer by making gallons of hand sanitizer herself and calling customers she knew had a need for the sanitizer. The Drug Store employees also regularly ran supplies or prescriptions out to customers' cars who were too afraid of catching the virus to walk inside the store.

77.     On September 11, 2020, the Board issued a subpoena to Lisa Leonard and The Drug Store and requested all records pertaining to COVID-19 IgG/IgM testing. Lisa Leonard gathered the records requested and sent them to the Board.

**G.     Events Following the Halting of Tests at The Drug Store**

78.     In October 2020, HHS released guidance clarifying that the PREP Act declaration specifically applied to pharmacist technicians and identified pharmacy technicians as covered persons under the Prep Act.[19]   HHS' guidance further clarified that pharmacy technicians may administer "COVID-19 tests, including serology tests" and that HHS' guidance on pharmacy technicians specifically "preempts any state and local law that prohibits or effectively prohibits those who satisfy these requirements from administering COVID-19 tests."[20]

79.     HHS further memorialized this clarification in a December 9, 2020 amendment to the COVID-19 PREP Act declaration, stating that "pharmacists, pharmacy interns, and pharmacy technicians who order or administer certain COVID-19 tests and certain vaccines" are both covered persons and qualified persons under the PREP Act, **retroactive to February 4, 2020.**[21]

---

[19] *Guidance for PREP Act Coverage for Qualified Pharmacy Technicians and State-Authorized Pharmacy Interns for Childhood Vaccines, COVID-19 Vaccines, and COVID-19 Testing*, HHS Guidance, issued October 20, 2020, *available at:*
https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents//prep-act-guidance.pdf.
[20] *Id.* at 4-5.
[21] Fourth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 FR 79190 (December 9, 2020)(Fourth

80. On December 1, 2020, almost three months after The Drug Store stopped administering antibody tests, BoP Investigator Mark Delk visited The Drug Store and asked Lisa Leonard and Craig Leonard to provide handwritten statements regarding the long-resolved, then fifteen years ago, 2005 incident involving Glenn Wells pulling his gun.[22] The Leonards provided the requested statements but were not allowed to make nor given a copy of their own statements. (These statements still have not been produced by the Board pursuant to discovery requests in the Board proceeding.)

81. Beyond the explicit state and local preemptions included in the PREP Act, the declaration, and the clarifying guidance, HHS also issued an advisory opinion to reinforce that the PREP Act provides complete preemption to "state or local requirements, such as state licensing laws, that would prohibit or effectively prohibit qualifying state-licensed pharmacists from ordering and administering FDA-approved COVID-19 tests[.]"[23] HHS clarified in a footnote that any guidance in the opinion also applied to "pharmacist-supervised pharmacy technicians."[24] In

---

Amendment). https://www.federalregister.gov/documents/2020/12/09/2020-26977/fourth-amendment-to-the-declaration-under-the-public-readiness-and-emergency-preparedness-act-for.

[22] Lisa Leonard and The Drug Store have fully discharged their obligations under the 2006 prior order and have, until last summer's campaign of vindictive harassment, operated without any further incident.

[23] Preemption of State and Local Requirements Under a PREP Act Declaration, Memorandum Opinion for the General Counsel Department of Health and Human Services, Advisory Slip Opinion 21-02, published January 19, 2021, *available at*: https://www.justice.gov/olc/file/1356956/download.

[24] *Id.* at 5, footnote 8.

discussing licensing boards, HHS held "[w]e think that it would be incongruous for Congress to grant the Secretary the authority to immunize those persons from suit in connection with a public health emergency, while nonetheless permitting the States, ***through licensing requirements***, to take the very action that the Secretary's declaration identified as necessary to respond to a public health emergency."[25]

82.     On March 9, 2021, the BoP issued a 37-count Statement of Charges against Lisa Leonard and The Drug Store.  The Statement of Charges accuses Lisa Leonard of "administering a COVID-19 Antibody Test(s) (Test) which you represented would provide a diagnosis for COVID-19 when, in fact, any such representation(s) were false, deceptive, and/or misleading…;" telling patients they were cleared to return to work or travel or get a medical treatment based on their test results; allowing JoAnna Taylor, a pharmacy technician, to administer COVID-19 antibody tests; not using a Sharps container; not using a new, clean alcohol wipe for each customer; not recording allergy information for each customer receiving a COVID-19 antibody test; failing to use Personal Protective Equipment (PPE) while administering the COVID-19 antibody test; and falsely representing that Glenn Wells brandished a gun during the 2005 incident at The Drug Store.  Several of the charges included sub-counts alleging that the violation charged also violated, in

---

[25] *Id.* at 10 (emphasis added).

some instances, several sections of the BoP's code of conduct. (The Board members are all pharmacists, so they are subject to the same code of conduct—as is Beams.)

83.    Lisa Leonard and The Drug Store filed answers denying the charges, and a "hearing" is currently set for November 3-4, 2021 at the BoP, at which the BoP is supposed to have the burden of proof.

84.    The Board recently amended its charges expanding them to fifty counts, without new information. The new charges will be addressed in due course, but they consist entirely of further claims regarding COVID-19 antibody testing—again, over which the Board has no jurisdiction.

85.    The defendants are also now threatening employees of The Drug Store—including the part-time pharmacist and a pharmacy technician—with charges. There is no more basis for charges against these employees than there is against the plaintiffs, and the Board's illegal effort to disrupt The Drug Store's operations and intimidate its owners and employees is transparent.

**H.    There Were No Customer Complaints Made Directly to Lisa Leonard or The Drug Store About COVID-19 Antibody Tests—Only Those Manufactured by Beams, Their Competitor, and Proffered to the Board: Plaintiffs Have Served Their Community Well.**

86.    Requests from the community, dentists, doctors, and businesses were made to The Drug Store as people scrambled to obtain information in a vacuum and to provide reliable information in the midst of chaos. The Drug Store provided antibody testing requested by several groups and businesses, including the nearby

KIA plant, the Lee County Youth Development Center, US Foods, Macon County Courthouse personnel, and Macon County Road and Bridge employees, among others. (During his repeated phone calls to The Drug Store, Beams continually accused Lisa Leonard of having a "contract" with KIA.)

87.     During the time The Drug Store offered antibody testing, Lisa Leonard made it clear, repeatedly, that customers should *not* get tested *unless* they were symptomatic. In her unsolicited April 27, 2020 television interview with WTVM, the reporter told viewers, "Leonard says anybody can get the test but right now there is a limited supply and suggests if you're not currently showing symptoms and are instead curious, wait and you'll save some money." Lisa Leonard then appeared on camera and said, "We have actually ordered the tests directly from the wholesaler. So it'll be a much less expensive test. It's the exact same test, it just won't have the telemedicine incorporated into the fee." Lisa Leonard chose the antibody test because it was not invasive and the cost for a private pay swab test was going to be $100 per test: She wanted to offer an affordable test.

88.     Other Alabama pharmacies offered and continue to offer antibody testing during this never-ending pandemic, including EAMC, and they have not been "investigated," subjected to vindictive "charges," or otherwise harassed, oppressed, disparaged, and harmed. No other pharmacies are known to have been told they were to stop administering the tests, proving that the Board and/or one of its

investigators specifically targeted Lisa Leonard and/or The Drug Store as a result of a personal vendetta.

89.   A total of 5,949 tests were administered at The Drug Store without a single incident or complaint of physical injury, infection, or other adverse customer outcome.

90.   Governor Ivey issued her latest COVID-19 Emergency Proclamation as recently as August 13, 2021, continuing the series of such proclamations she has issued since March 13, 2020. *See* Exhibit 15.

91.   On September 1, 2021, there were 699,729 recorded cases of COVID-19 infection in Alabama, with 12,283 deaths.[26]  In the United States, there were a total of 39,314,238 positive cases, with 640,478 deaths from COVID-19[27], while worldwide the totals were 217,843,003 cases and 4,519,591 deaths.[28]

## Bases for Relief Sought by Plaintiffs

**A.   The Board's Jurisdiction is Limited to Its Delegated Authority, Powers, and Duties, and the Board's Actions are Illegal, *Ultra Vires*, and Preempted by Federal Law.**

92.   An administrative agency or board has no authority to act outside of its delegated legislative authority.  Any actions taken by an agency or board not within

---

[26] https://www.nytimes.com/interactive/2021/us/alabama-covid-cases.html.
[27] https://www.nytimes.com/interactive/2021/us-covid-cases.html.
[28] https://www.nytimes.com/interactive/2021/world/covid-cases.html.

its legal authority is *ultra vires*, illegal, and arbitrary and capricious.  Such actions are subject to injunction and other remedies.

93.   The Board has no legal authority over COVID-19 antibody tests or testing.  Providing COVID-19 antibody tests does not adversely affect the public health, safety, and welfare of the people of Alabama; to the contrary, such tests simply provide information.  Providing such tests also does not constitute the compounding or dispensing of prescription drugs and medicines. *See* Ala. Code § 34-23-2.

94.   COVID-19 antibody tests are not subject to the Board's authority as "biological products,"[29] "chemicals,"[30] "drugs,"[31] a "legend drug,"[32] "medicine,"[33] "patent or proprietary medicines,"[34] a "poison,"[35] or a "prescription."[36]  Nor, as a result, is the act of COVID-19 antibody testing a "dispensing"[37] or "sale"[38] of a biological product, chemical, drug, legend drug, medicine, patent or proprietary medicine, poison, or prescription.  A "pharmacist" is "[a]ny person licensed by the [B]oard to practice the profession of "pharmacy," and a "pharmacy" is "[a] place...in

---

[29]  Ala. Code § 34-23-1(2); 42 U.S.C. § 262.
[30]  Ala. Code § 34-23-1(4).
[31]  Ala. Code § 34-23-1(6).
[32]  Ala. Code § 34-23-1(11).
[33]  Ala. Code § 34-23-1(15).
[34]  Ala. Code § 34-23-1(17).
[35]  Ala. Code § 34-23-1(23).
[36]  Ala. Code § 34-23-1(25).
[37]  Ala. Code § 34-23-1(5)
[38]  Ala. Code § 34-23-1(29).

{B4112082}                                          36

which prescription drugs, medicines, medical devices, chemicals, and poisons are sold…." Ala. Code § 34-23-1(20)-(21).

95.    The Board's powers and duties are set forth in Ala. Code § 34-23-92. None of those powers or duties provide any jurisdiction over nor any specific regulations that fairly address COVID-19 antibody testing or any of the accoutrements of COVID-19 testing such as who can administer such tests, the use of sharps containers, the use of alcohol wipes, the recording of allergy information, or the use of PPE. Ala. Code § 34-23-92(1)-(14).

96.    The Board has the power to regulate the practice of pharmacy, *see* Ala. Code § 34-23-92.1—subject, of course, to state and federal constitutional limitations.

97.    The Board's drug investigators are supposed to be persons of "good moral character" and "have the power to inspect the medicines and drugs or drug products or domestic remedies which are manufactured, packaged, packed, made, sold, offered for sale, exposed for sale or kept for sale in this state, and *for this purpose* shall have the right to enter and inspect during business hours any pharmacy…in this state." Ala. Code § 34-23-3 (emphasis added). Furthermore, "Each state drug investigator shall be subject to the same restrictions as other officers of the law in regard to search and seizure." Ala. Code §§ 34-23-3. Drug investigators have the right to inspect specific enumerated types of documents and

records "[w]hen authorized by the [B]oard and *where there are specific complaints*"—none of which pertain to COVID-19 antibody tests. <u>See</u> Ala. Code § 34-23-3 (emphasis added). Finally, and of particular relevance here regarding the Board's investigators, "As directed by the board, *it shall be the duty* of state drug investigators *to issue citations for violations* of such laws, rules, or regulations or institute criminal proceedings against persons for such violations." Ala. Code § 34-23-3 (emphasis added).

98.    The Board has "[t]he power to make rules regulating the practice of pharmacy," which "includes the power to prohibit unlicensed persons from practicing pharmacy and the power to regulate how licensed persons practice pharmacy." This means, plainly, that the Board has the power to regulate how prescriptions, drugs, medicines, chemicals, and poisons are sold, but nothing more than is specified in the statute. Ala. Code §§ 34-23-1(20)-(21).

99.    The Board had and has no regulations that directly pertain to COVID-19 antibody testing, and, to the extent that the Board is attempting to stretch its extant regulations to such testing, the regulations are unconstitutionally vague, unenforceable, and, in any event, are preempted by the PREP Act. Nothing in the statutes empowers the Board to regulate the administration of COVID-19 antibody tests to consumers who have requested an antibody test during a pandemic emergency or otherwise. Nothing in the statutes empowers the Board's investigators

to exceed the Board's jurisdiction for their own purposes to grind axes, pursue

vendettas, or make pharmacists' lives miserable.

**B.    North Carolina Dental, the Sherman Act, the U.S. Constitution's Commerce Clause, and the Board's Lack of *Parker* Immunity Mandate Relief from the Defendants' Anticompetitive Activities.**

100.    Section 1 of the Sherman Act, 15 U.S.C. § 1, states as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction therefor, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

101.    The Sherman Act provides an independent basis for an injunction to

prevent enforcement of laws or regulations that negatively impact competition and

consumers by increasing prices and reducing access and innovation, and suspect

assertions regarding quality of care evidence such actions.  *Teladoc, Inc. v. Texas

Medical Bd.*, 112 F. Supp. 3d 529 (W.D. Tex. 2015).  A state cannot give immunity

to those who violate sections 1-7 of the Sherman Act by authorizing them to violate

these sections or by declaring that their action in doing so is lawful.  *Parker v. Brown,*

317 U.S. 341 (1943); *Marnell v. United Parcel Service of America, Inc.*, 260 F. Supp. 391 (N.D. Cal. 1966).

102.   The mere façade of state involvement is insufficient to ensure states accept political accountability for the anticompetitive conduct they permit and control for *Parker* state-action immunity for state agencies. *North Carolina Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494 (2015); *see also F.T.C v. v. Indiana Federation of Dentists*, 476 U.S. 447 (2009)(conspiracy among dentists was not immune from antitrust liability where there was no active supervision by the state); *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810 (11th Cir. 1990)(no antitrust immunity where no authority for direct supervision of board of commissioners' personnel decisions); *Shahawy v. Harrison*, 875 F.2d 1529 (11th Cir. 1989)(no immunity for hospital board where no agency or official actively supervised peer review process, and Florida courts' limited review of process did not satisfy active supervision requirement).

103.   The Board here fails the two-factor "*Midcal* test" for *Parker* immunity set forth in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) because, even if , hypothetically, the first factor were met (which is not conceded)—i.e., that the state has articulated a clear policy to allow the anticompetitive conduct at issue—the second factor—i.e., that the state provides *active* supervision of the anticompetitive conduct—clearly is not: there is no

effective supervision of the Board's actions at all. The Board is not authorized by the state to engage in a targeted prosecution of an individual pharmacist and the family pharmacy based on trumped up charges over which the Board has no jurisdiction and which prosecution is based on *ultra vires* subject matter that results in anticompetitive injury and injury to constitutional rights.

104. Where, as here, a state board's actions are administrative and not legislative action, the Board is *not* entitled to assert a state action defense to alleged violations of the Sherman Act. *Anheuser-Busch, Inc. v. Goodman*, 745 F. Supp. 1048 (M.D. Pa. 1990).

105. State action immunity is also subject to the following limitations: (a) state immunity is not conferred merely by a state authorizing violations under sections 1-7; (b) a private conspiracy is not safe from liability under sections 1-7 simply because a state joins the conspiracy; (c) only closely supervised anticompetitive practices in an area where the state clearly sets out intention to substitute regulation for competition should provide immunity; and (d) only where the individual action is compelled, as opposed to condoned, by the state, will immunity be found. *Hecht Co. v. Southern Union Co.*, 474 F. Supp. 1022 (D. N. Mex. 1979); *see also Ticket Center, Inc. v. Banco Popular de Puerto Rico*, 441 F. Supp. 2d 354 (D. Puerto Rico 2006)(officials must exercise power to review anticompetitive acts purportedly authorized); *see also Goldfarb v. Virginia State*

*Bar*, 421 U.S. 773, 791 (1975)("The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members.").

106.    The Alabama legislature attempted "to immunize the Board of Pharmacy and its members from liability under state and federal anti-trust laws for the adoption of a rule that prioritizes patient safety and wellness, but may be anticompetitive when the effect on public safety and wellness is clearly demonstrated and documented by the Board of Pharmacy," Ala. Code § 34-23-92.1(a)(4), by stating "rules adopted by the board may define and regulate the practice of pharmacy in a way that prioritizes patient safety and wellness, even if the rule is anticompetitive when the effect on public safety and wellness is clearly demonstrated and documented by the Board of Pharmacy," Ala. Code § 34-23-92.1(b), "[s]ubject to subsection (c)," which says, "A rule adopted by the Board may supplement or clarify any statutory definition but may not conflict with any statute that defines the practice of pharmacy," Ala. Code § 34-23-92.1(c).

107.    This statutory enactment is ineffective to confer immunity, however, because even if it was an adequate statement of state policy, there is no provision for "active supervision" of the Board's actions.    Constant requirements of active supervision include the following:

- "The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to

produce it." *North Carolina Bd. of Dental Examiners*, 574 U.S. at 497 (citing *Patrick v. Burget*, 486 U.S. 94, 102-03 (1988).

- "[T]he supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy." 574 U.S. at 497 (citing 486 U.S. at 102-03).

- "[T]he mere potential for state supervision is not an adequate substitute for a decision by the State." 574 U.S. at 497 (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 638 (1992)).

- "[T]he state supervisor may not itself be a market participant." 574 U.S. at 497.

108.   As *North Carolina Bd. of Dental Examiners* further makes clear,

> The Sherman Act protects competition while also respecting federalism. It does not authorize the states to abandon market to the unsupervised control of active market participants, whether trade association or hybrid agencies. If a state wants to rely on active market participants as regulators, it must provide active supervision if state-action immunity under <u>Parker</u> is to be invoked.

574 U.S. at 515. No such immunity exists here because there is no such supervision of these defendants. (In addition, there are not even any specifically pertinent regulations that support the Board's actions.)

109.   There is no "learned profession" exemption from the proscription against restraint or monopolization of trade. *Ballard v. Blue Shield of Southern West Virginia, Inc.*, 543 F.2d 1075 (1976); *U.S. Dental Institute v. American Ass'n of Orthodontists*, 396 F. Supp. 565 (N.D. Ill. 1975). The professional status of pharmacist and pharmaceutical association is no defense to antitrust violations.

*Northern Cal. Pharmaceutical Ass'n v. U.S.*, 306 F.2d 379 (9th Cir. 1962). It is also well established that commendable motives, sound purposes, and a lack of intention to harm (none of which are present here) do not provide defenses to the violation of the antitrust laws.

110.    Interstate commerce exists where business activities include receipt of drugs, chemicals, equipment, and supplies purchased and shipped in interstate commerce. *See, e.g., U.S. v. American Service Corp.*, 580 F.2d 823 (5th Cir. 1978)(linens and linen supplies); *Bhan v. NME Hospitals, Inc.*, 669 F. Supp. 998 (E.D. Cal. 1987), *aff'd* 929 F. 2d 1404 (chemicals and supplies for anesthesia). The COVID-19 antibody tests at issue were sent to plaintiffs from Texas. An apparently local activity will be considered "in interstate commerce" for antitrust purposes when it is an essential component of an inseparable interstate activity. *Bain v. Henderson*, 621 F.2d 959 (9th Cir. 1980). Wholly local business restraints can produce effects banned by the Sherman Act. *U.S. v. Central States Theatre Corp.*, 187 F. Supp. 114 (D. Neb. 1960).

111.    Any concerted effort to exclude others from the market must be regarded by its very nature as an undue or unreasonable restraint of trade and an illegal destruction of the free operation of competitive forces. An agreement or combination suffices for Section 1 purposes as does a conspiracy. Conspiracies may be inferred from the things actually done. *Eastern States Retail Lumber Dealers'*

*Ass'n v. U.S.*, 234 U.S. 600 (1914); *see State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247 (S.D. Ohio 1996)(validating inference of illegal action from circumstantial evidence). A conspiracy that operates upon the flow of commodities in interstate commerce is within the ambit of sections 1-7 of the Sherman Act, *U.S. v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963), and a conspiracy to restrain interstate commerce may be found even though not all conspirators are involved in such commerce, *U.S. v. General Motors Corp.*, 2 F.R.D. 346 (N.D. Ill. 1942). *See also Brader v. Allegheny General Hosp.*, 64 F.3d 869 (3rd Cir. 1995)(limitation of physician's ability to serve patients in the relevant market adequately alleged effect on interstate commerce under the Sherman Act).

112.  District courts may grant preliminary injunctive relief and design an injunction prohibiting enforcement of a regulatory scheme where a plaintiff establishes possible irreparable injury to its ability to compete as the result of the regulatory scheme's anticompetitive effect and that the scheme was not exempt from the antitrust laws under the doctrine of *Parker v. Brown. Knudsen Corp. v. Nevada State Dairy Com'n*, 676 F.2d 374 (9th Cir. 1982).

113.  Defendants must be prohibited from violating the antitrust laws—especially where their actions have no immunity because they are not actively supervised and where, even if actively supervised, are so outside the scope of any

legal authority that they are still wrongful per se because their actions are flagrantly unconstitutional.

**C.    Plaintiffs Must Be Protected Against the Violation of Their Constitutional Rights By the Board's Irrational, Predatory, and Retaliatory Actions Under the Pretext of Enforcement.**

114.    When government harms individuals, the injury is, as here, often imposed by threats to, or denial or deprivation of, a government benefit such as a job, license, or permit.  Courts have repeatedly spoken to the judicial duty to protect citizens from arbitrary "official" persecution:

> If the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court…[N]either in terms nor in interpretation is the [equal protection] clause limited to protecting members of identifiable groups.  It has long been understood to provide a king of last-ditch protection against government action….

*Esmail v. Macrane*, 53 F.3d 176, 179-80 (7th Cir. 1995), *cited in Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  And, in the words of the U.S. Supreme Court,

> When we consider the nature and the theory of our institutions of government…they do not leave room for the play and action of *purely personal and arbitrary power*…[T]he very idea that one man may be compelled to hold his life, of the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems intolerable in any country where freedom prevails….

*Yick Wo v. Hopkins*, 118 U.S. 356, 369-70 (1886). Here, there is no actual, effective supervision or check on the Board's powers. The Board's abusive actions *must* be stopped. The lack of active supervision over the Board *must* be corrected. Federal law, not least that embodied in the U.S. Constitution, *requires* the termination of the abuse and the imposition of effective control over an unsupervised Board with otherwise unfettered power.

115. The Board's *ultra vires* actions under the pretext of COVID-19 antibody testing, over which the Board has no jurisdiction, are nothing more than the exercise of sheer vindictiveness against Lisa Leonard and The Drug Store. The defendants are prosecuting an orchestrated campaign of official harassment directed against plaintiffs out of nothing more than malice. The courts have determined that such objectives are illegitimate. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446-47 (1985)(a personal vendetta, malice, or bad faith intent to injure are *not* legitimate objectives); *Esmail v. Macrane*, 53 F.3d at 178-80 (mistreating a single person because of not liking him or her violates the Constitution).

116. Abusive tactics that have been addressed by federal courts and rejected are very much those exercised by defendants here—the threat of or actual denial of licenses, harassment of business owners and their employees by intrusive surveillance, and other tactics. *See, e.g., Esmail*, 53 F.3d at 178. Victims of such

abusive tactics are also financially harmed by having to incur legal fees in an effort to protect themselves in the courts. *See, e.g., Esmail*, 53 F.3d at 177.

117.   Where, as here, regulatory and enforcement powers are used in a manner calculated to harm plaintiffs, hostility is demonstrated, and the defendants must be held accountable. *See Jetstream AERO Services, Inc. v. New Hanover County*, 1989 WL 100644, at *3 (4th Cir. August 15, 1989)("if defendant went after plaintiff to get him, for any reason, he should be liable"); *Ziegler v. Jackson*, 638 F.2d 776, 777-78 (5th Cir. 1981)(no justification for disparate treatment even where no suspect classes included and plaintiff culpable of some wrongdoing). "[A]uthority to harass a business without cause is not a legitimate state interest." *Jetstream*, 1989 WL 10644, at *5.

118.   "Equal protection rights may be violated by gross abuse of power...or fundamentally unfair procedures." *Dean Tarry Corp. v. Friedlander*, 650 F. Supp. 1544, 1552 (S.D.N.Y. 1987), *aff'd*, 826 F.2d 210 (2d Cir. 1987).  A violation may be premised on proof that officials "are guilty of grave unfairness in the discharge of their responsibilities." *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988); *see also Benigni v. City of Hemet*, 879 F.2d 473 (9th Cir. 1988)(conduct, including harassment, intentionally directed to force someone out of business is actionable as a violation of substantive due process).

119. The indicia of improper and retaliatory actions by the Board are abundant in this case:

(a)    The Board's "informers" and investigators have demonstrated hostile attitudes toward plaintiffs;

(b)    Plaintiffs are being treated disparately compared to other pharmacists or pharmacies who are and have been involved in COVID-19 antibody testing;

(c)    The Board members are competing market participants, as is one of their principal collaborators, so they have a pecuniary and unsupervised anticompetitive interest in driving plaintiffs from the market;

(d)    Plaintiffs have been dealt with in an abusive, bullying, and accusatory manner, tone, and language throughout the relevant time period;

(e)    The defendants are attempting to regulate outside of its legal authority—*ultra vires*—and doing so in an area that is the subject of preemptive federal action, which establishes arbitrariness and wrongful conduct by defendants;

(f)    Defendants have deviated from routine procedures, including sending one or more investigators with personal vendettas outside of their assigned territories and have subsequently, once plaintiffs raised the issue, scrubbed their website in an effort to cover the defendants' tracks;

(g)     Defendants issued charges against plaintiffs and threatened charges against The Drug Store's employees without issuing any citations, directive to stop testing, or providing specific notices of the authority by which the defendants purport to be able to regulate such testing (because defendants have no such authority and because the testing issue is wholly pretextual); and

(h)     Defendants have resurrected a now 15-year-old dispute about the Glenn Wells gun incident in order to threaten and attempt to bootstrap to further discipline to destroy plaintiffs' livelihoods and those of their threatened employees.

## D.     Relief Must Be Granted to Plaintiffs, Or They Will Suffer Permanent and Irreparable Harm.

120.   Plaintiffs face an absolute existential threat—including loss of license and permit, oppressive financial penalties beyond the scope of any ever known to have been assessed by the Board, closure, termination of employees, destruction of reputation and business goodwill long in the making, and, possibly, bankruptcy. Or, plaintiffs can accept a non-negotiable, extortionate demand from the Board that includes severe, mandatory discipline and hundreds of thousands of dollars in fines. Because of these personal, *ultra vires*, illegal, anticompetitive, and unconstitutional attacks on the plaintiffs, the community as a whole, including plaintiffs' customers, as well as plaintiffs themselves, will suffer loss, cost, and damage. In addition, the Board's vindictive and punitive actions will be, for all practical purposes, green-

lighted as absolute and unchecked for any other pharmacists and pharmacies as they are for Lisa Leonard and The Drug Store.

121.   The Board is persecuting plaintiffs based on bogus allegations regarding COVID-19 antibody tests over which the Board has no jurisdiction.  The allegations are driven by Beams, a direct market competitor who aspires to be a Board member, and by Wells' personal animus, which is evidenced by a record of extraordinary acts of harassment against Lisa Leonard and The Drug Store.

122.   The Board has not fully provided all pertinent discovery, including statements taken from Lisa Leonard and Craig Leonard back in 2020 regarding the 15-year-old Glenn Wells gun incident.   The Board's refusal to produce the statements is yet another example of its cavalier disregard of fundamental fairness and obvious intent to prejudice plaintiffs.

123.   The federal authorization of the administration of COVID-19 tests by a range of individuals and types of entities in addition to pharmacists and pharmacy technicians demonstrates that the professional licensing or designation in the context was incidental, not fundamental.

124.   Lisa Leonard and The Drug Store did not provide a diagnosis to any customer.  The test results speak for themselves—as does the disclaimer.

125.   There is also no rational basis for the Board's assertion of jurisdiction— either by virtue of the plain language of the law or the public safety, health, and

welfare. If anything, the Board's heedless assertion of charges against Lisa Leonard and The Drug Store threatens access to information, testing, and pharmacy services (which are not even at issue in this proceeding), advance a Board employee's personal vendetta against Lisa Leonard and her family pharmacy, have an unchecked and unsupervised anticompetitive effect, and directly advance the interests of Beams, a local market competitor of Lisa Leonard's and The Drug Store's.

126.   The actions of the Board, its investigators, and the Board members individually do not advance or protect the public's safety, health, and welfare, but rather deliberately harm it by guaranteeing in present and the future that any pharmacist or pharmacy will not provide affordable testing in a pandemic or other emergency to its customers at their request for fear of being sanctioned, de-licensed, fined, and penalized by the Board without just cause.

127.   The Board's charges are arbitrary, capricious, and not rationally based in law, and they have an anticompetitive effect in the relevant market. They do not serve a legitimate public interest because the charges (1) are beyond the Board's rulemaking authority, (2) reduce Alabama's citizens' access to care, (3) decrease the availability of testing which increases its cost, (4) do not protect the public and inappropriately regulate a safe act, (5) discriminate, intentionally and selectively, against Lisa Leonard and The Drug Store but not pharmacists and pharmacies who were performing the same testing in the same manner without rational basis, and (6)

will irreparably harm plaintiffs by depriving them of their pharmacy license and permit and otherwise deprives them of their constitutionally protected liberty and property interests because the clear intention of the Board is to drive Lisa Leonard and The Drug Store out of business to allow favored entities—both individually owned, chain, and institutional—to absorb The Drug Store's market share.

128.   The "relevant market" in which to evaluate the anticompetitive effect of the conduct of defendants is the market for pharmacists and pharmacies in Auburn-Opelika, Lee County, and Alabama.

129.   The relevant products and services in this market are COVID-19 antibody tests (not subject to Board regulation) and pharmacist services and pharmacy products that are actually within the BoP jurisdiction.

130.   The relevant geographic market is properly limited to Auburn-Opelika, Lee County, and Alabama.

**(1)    The Board is exceeding its authority.**

131.   The Board is limited in its authority and can only regulate the practice of pharmacy by pharmacists and pharmacies.  The Board has no authority to regulate industries or activities that do not constitute the "practice of pharmacy."

132.   The Board has impermissibly exceeded the scope of its authority in attempting to regulate COVID-19 antibody testing and in persecuting the plaintiffs.

133.   The self-serving decisions of the Board are designed to protect the business interests of pharmacists and pharmacies favored by the Board.

**(2)   The Board's actions reduce Alabama citizens' pharmacy options and their access to care.**

134.   The Board's charges with respect to Lisa Leonard and The Drug Store has and will continue to diminish Alabama citizens' access to COVID-19 antibody testing in a convenient pharmacy setting.

135.   Community pharmacists and pharmacies are the most accessible healthcare professionals to the general public and the "first touch point of patient engagement with the healthcare system." They are "trusted healthcare professionals with established relationships with their patients" and play a vital role in the COVID-19 response.  Erick Wesley Hedima, Community Pharmacists: On the frontline of health service against COVID-19 in LMICs, Research in social and administrative pharmacy, 2021; 17(1): 1964-1966.

136.   Notwithstanding the numerous untested and unvaccinated people in Alabama during this pandemic, the Board is disincentivizing testing as it enforces the otherwise inapplicable pharmacy statutes and its regulations in a manner that needlessly complicates an otherwise safe act of antibody testing that can be performed in a variety of locations by a variety of personnel and can provide critical information to those people.

137.   If the Board prevails on its charges, Lisa Leonard and The Drug Store will no longer be able to provide *any* services—certainly not testing services, which have already been eliminated.  The pharmacist members of the Board, including those whose pharmacies provide similar testing in a similar manner, will have successfully driven a competitor from the professional market.

138.   During a pandemic emergency, information is not easy to obtain for anyone including pharmacists, pharmacies, and consumers.  As a result, the Board's actions will unnecessarily and arbitrarily drive up costs and decrease access to information in the relevant market based on the mistaken belief that providing test results to pharmacy customers is not permitted.

139.   Giving or receiving a COVID-19 antibody test is neither dangerous (it is a routine finger prick yielding a tiny drop of blood) nor risky (the customer is exposed only to the customer's own blood, not someone else's).  Nor does it require the knowledge, training, and education of a licensed medical doctor or nurse. Trained staff such as those employed by The Drug Store were and are capable of accurately administering COVID-19 antibody tests with no risk of harm to a consumer.

**(3)     The Board's actions will chill pharmacists' and pharmacies' willingness to assist customers in emergencies.**

140.   Lisa Leonard and The Drug Store have and will continue to suffer significant economic injury and damage as a result of the Board's actions.  They

have suffered lost business because they have been prevented from offering permissible services, including services at lower prices than those offered by other in-state pharmacists and pharmacies.

141.   Indeed, the only parties who benefit from the Board's misinterpretation of its authority and the Alabama regulations governing the practice of pharmacy are the licensed pharmacists and pharmacies in Lee County in particular, and in Alabama in general, who offered, offer, or will offer such services in their own local pharmacies, including individual members of the Board themselves and competitor, initiator, and Board-aspirant, Beams.   In the absence of competition from Lisa Leonard and The Drug Store, they will be able to charge higher total prices to consumers for the same services, and other pharmacy services and products that Lisa Leonard and The Drug Store will no longer be able to provide.   Such anticompetitive activities drive up consumer prices and costs.

**(4)   The Board's actions injure and do not protect the public.**

142.   According to the FDA, COVID-19 antibody tests can help identify people who may have been infected with the SARS-CoV-2 virus or have recovered from a COVID-19 infection.   Pharmacists and pharmacies are the most accessible healthcare professionals to the public, and their ability to provide antibody tests during the pandemic was clearly a benefit to the public.

143.   The antibody tests presented no risk to consumers.  Consumers could, and did, read the results for themselves along with a plain English disclaimer. Therefore, the Board's actions have no rational basis and unnecessarily punish a safe act.  The Board is imposing a regulatory burden that does not provide any additional protection to the public and that is not within the Board's authority in any event.

144.   Plaintiffs performed these tests without receiving a single complaint of physical injury, infection, or other adverse patient outcome.

145.   The Board's actions also injure the integrity of the State's licensing of pharmacists and pharmacies.

### (5)   The Board's actions place unreasonable and unnecessary restraints on harmless and useful activities.

146.   The Board seeks to disproportionately restrain the pursuit of safe activities by plaintiffs and focuses its actions on plaintiffs in a selective and discriminatory manner.  Such actions are diametrically opposed to the fundamental purpose for which the Board supposedly exists—to objectively and fairly regulate pharmacists and pharmacies within the scope of its properly circumscribed authority under Alabama law.

147.   In fact, the adoption of the Board's position regarding COVID-19 antibody testing, as evidenced in the statement of charges, would necessitate the implausible finding that any person administering a COVID-19 antibody test is

practicing pharmacy. This results in restrictions being placed on activities not within the Board's jurisdiction and that are the express subject of federal preemption.

148.  Administering a COVID-19 antibody test is not a threat to patient safety.

149.  The administration of COVID-19 antibody tests does not constitute the practice of pharmacy and is not in need of oversight or regulation by the Board.

**(6)  Plaintiffs cannot, receive a fair hearing before the Board due to the Board members pecuniary interest and other biases, including the personal animus of the Board and its investigators, so the Court must intervene.**

150.  A fair trial in a fair tribunal is a basic requirement of due process, and fairness applies to administrative agencies that adjudicate as well as to courts. Not only is a biased decisionmaker constitutionally unacceptable, but the law must endeavor to prevent even the probability of unfairness. The same is true of a case in which the decisionmaker's actions telegraph a lack of objectivity and fairness—including bias on the part of investigators and other strong-arm tactics.

151.  Based on the facts presented here, a realistic appraisal of psychological tendencies and human weakness, combined with pecuniary interest, presents a risk of unconstitutional bias too great for the defendants to rebut. A case such as this one in which the adjudicator has a pecuniary interest in the outcome and/or personal animus makes the probability of actual bias on the part of the decisionmaker too high to be constitutionally tolerable.

{B4112082}

152.   Yet another point of bias is that at least two individuals who are believed to be immediately related to Board members sought to be and were voluntarily tested for COVID-19 antibodies at The Drug Store.  Neither of those individuals has made any complaint to plaintiffs about *their* testing or results, and neither has been identified as a potential Board witness at the scheduled hearing, which suggests that both were perfectly satisfied with their tests.  In any event, if there are familial relationships between Board members and witnesses, that too suggests a disqualifying appearance of impropriety and/or bias.

153.   Plaintiffs simply cannot receive a fair trial before these defendants: "What is a fair trial?  Perhaps no precise definition can be given it, but it certainly must be one where the accused's legal rights are safeguarded and respected." *Scarbrough v. State*, 37 So.2d 748, 750 (Miss. 1948)(reversing case due to prosecutorial misconduct at trial)(quoting *Fisher v. State*, 110 So. 361, 365 (Miss. 1926)).  It is already patently obvious that plaintiffs will not be treated fairly nor will their legal rights be respected by these defendants.

154.   A district court can look into the merits of a case and determine the fairness of state administrative proceedings and has jurisdiction to enjoin acts of administrative officials which are unsupported by statutory authority or work a deprivation of a constitutional right.  *See Lester v. Parker*, 235 F.2d 787, 790 (9th Cir. 1956)(courts have fundamental power and duty to protect individual rights

against unlawful and unauthorized administrative power by injunction requiring affirmative action, particularly where the right is a constitutional one)(citing *Stark v. Wickard*, 321 U.S. 288, 308 (1944)).

155.   Here, plaintiffs are enduring a case of manifest oppression.  The district court may issue an injunction "if an agency refuses to dismiss a proceeding that is plainly beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order." *Pepsico, Inc. v. FTC*, 472 F.2d 179, 187 (2d Cir. 1972); *see Cook v. Ochsner Foundation Hospital*, 61 F.R.D. 354, 361 (E.D. La. 1972)(federal courts may enjoin such administrative action or inaction when it is violative of legislative enactments).   Courts certainly have the power to enjoin harassment. *Lewis v. S.S. Baune*, 534 F.2d 1115, 1122 (5th Cir. 1976)(citing *Bivens v. Six Unknown Named Agents of Fed. Bur. of Nar.*, 409 F.2d 718, 725 (2d Cir. 1969), *rev'd on other grounds*, 403 U.S. 388 (1971)).

156.   Misuse of power, possessed by private citizens only because the wrongdoer is clothed with the authority of state law, such as the use of position to deprive another of her constitutional rights, is taken "under color" of state law for purposes of 42 U.S.C. § 1983.

157.   Healthcare providers have stated claims under Section 1983 against licensing authorities for the malicious and reckless taking of property—licensing— and other wrongdoing. *See Bloom v. New York State Com'r of Health*, 573 F. Supp.

2d 732, 742 (E.D.N.Y. 2004)(neurosurgeon stated due process claims regarding loss of ability to practice livelihood as medical doctor because medical bureau covered up its improprieties, perjury by investigator, and conspiracy); *Mishler v. Nevada State Bd. of Medical Examiners*, 896 F.2d 408, 410 (9th Cir. 1990)(Board delayed for 17 months in providing verification of physician's good standing to another state medical board rendering physician unable to practice).

158.   The threat by the Board to the plaintiffs' continued existence cannot be eliminated merely by plaintiffs presenting a defense in the administrative proceeding because of the pattern of contempt and persecution inflicted on plaintiffs by the defendants and their investigators.   Without intervention by the federal court, plaintiffs are very likely to be driven out of business without recourse.  Business will be lost, employees discharged, and further financial losses suffered.

159.   The district court can enjoin the Board from terminating plaintiffs' professional existence because the possibility of irreparable injury is obvious.  The evidence will prove that defendants' acts in attempting to shut down Lisa Leonard and The Drug Store are motivated by their desire to prevent plaintiffs from fairly addressing the alleged violations in the administrative hearing in order to reach a predetermined goal of closure. *See Park East Corp. v. Califano*, 435 F. Supp. 46, 55 (S.D.N.Y. 1977).

## Claim for Relief

160.   Professional licenses and permits constitute valuable property rights and interests within the meaning and protection of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.   Therefore, plaintiffs are likely—perhaps certain—to prevail on their underlying constitutional claims given the numerous and substantial improprieties by defendants.

161.   Plaintiffs seek to preserve the status quo without waiver of any rights, remedies, claims, and/or defenses—pending their receipt of a fair hearing with due process guarantees before a neutral, objective decisionmaker being actively supervised and having actual jurisdiction.   Plaintiffs therefore seek a preliminary injunction preventing the defendants from taking *any* action regarding plaintiffs' license and permit.

162.   Defendants should be enjoined from (1) taking action against plaintiffs' license and permit, respectively; (2) imposing irreparable harm on plaintiffs, their customers, and plaintiffs' employees; (3) acting outside the scope of the Board's statutory authority; (4) violating the antitrust laws; and (5) violating plaintiffs' constitutional rights to be free from selective, predatory, and retaliatory prosecution.

## COUNT ONE
## ILLEGAL, *ULTRA VIRES,* AND/ OR PREEMPTED ACTION BY THE DEFENDANTS
### (All Defendants)

163.   Plaintiffs incorporate by reference paragraphs 1 through 162 above, as if fully set out herein.

164.   Defendants and their collaborators and conspirators, including Beams and Wells, have harassed, targeted, maligned, intimidated, strong-armed, defamed, excoriated, abused, traumatized, harmed, and caused financial loss to plaintiffs.

165.   The Court must enjoin defendants from engaging in such *ultra vires* actions against plaintiffs, which are contrary to the limitations on the defendants' authority.  Even if the defendants had some authority or jurisdiction over COVID-19 antibody testing, such restrictive authority is preempted by the PREP Act.

166.   The defendants *ultra vires* actions against the plaintiffs are undertaken without cause, in bad faith, and in pursuit of personal animus, and therefore must be the subject of the Court's intervention to protect plaintiffs from further harm at the hands of defendants.

WHEREFORE, plaintiffs demand judgment against the defendants (1) for declaratory judgment under 28 U.S.C. §§ 2201 *et seq* and injunctive relief prohibiting any further *ultra vires* action against plaintiffs and (2) for such further, different, additional, and allied relief as the Court may deem appropriate, including attorneys' fees, litigation expenses, and costs.

{B4112082}

## COUNT TWO
## VIOLATION OF FEDERAL ANTITRUST LAWS
### (All Defendants)

167.   Plaintiffs re-allege and incorporate paragraphs 1 through 166 as if fully set forth herein.

168.   The defendants are involved and engaged in an illegal contract, combination, or conspiracy in restraint of trade and commerce to prevent plaintiffs from continuing to practice pharmacy in Alabama on pretextual grounds. Specifically, defendants have and are preventing plaintiffs—by intimidation, coercion, and/or boycott or other action—from providing COVID-19 antibody services for those who want to have them in the relevant market at a low cost, leaving consumers with only the remaining options that exist among plaintiffs' competitors, including, but not limited to, East Alabama Medical Center and Adams Pharmacy in Lee County, Alabama.  Defendants' unwarranted and self-serving restriction of the pharmacy services constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

169.   Exclusion of competitors from the market through efforts by market participants conflicts with the Commerce Clause, is inherently anticompetitive, is an undue and unreasonable restraint of trade, and an illegal destruction of the free operation of competitive forces thereby constituting an antitrust injury to plaintiffs and to a competitive market.

{B4112082}                                            64

170.   In furtherance of their contract, combination, or conspiracy in restraint of trade, the defendants have agreed and acted upon the making of charges related to matters over which they have no legitimate jurisdiction, thereby harming competition in the relevant market.  This agreement among defendants is expressed in defendants' statement of charges against plaintiffs and other actions taken by the Board's investigators, agents, and collaborators to preclude plaintiffs from administering COVID-19 antibody tests.

171.   As is evidenced by defendants' actions in targeting Lisa Leonard and The Drug Store for a biased investigation and in issuing the statement of charges outside the scope of the Board's authority, defendants demonstrated a unity of purpose, as well as common design and understanding, to reduce or eliminate competition in the relevant market.

172.   As is evidenced by defendants' actions, the defendants possessed, and still possess, a conscious commitment to a common scheme designed to achieve an unlawful objective.

173.   The defendants include five practicing pharmacists in the State of Alabama, and their actions constitute a continuing agreement, understanding, and concert of action among market participants.

174.   The defendants' actions have the purpose and effect of unreasonably restraining trade in the relevant market, the net effects of which are anticompetitive,

and any purported procompetitive justifications are illegitimate and pretextual. The defendants' actions have the following anticompetitive effects in the relevant market:

- selectively targeting for investigation and falsely accusing plaintiffs of wrongdoing in the administration of COVID-19 antibody tests during a pandemic emergency to favor themselves and their favored competitors;

- creating false barriers for market survival;

- reducing consumer choice and the availability of pharmacists and pharmacies COVID-19 antibody testing to consumers in Alabama; and

- reducing incentives for emergency participation in customer testing in pandemic emergencies when obviously greater, rather than lesser, participation is needed.

175.   Defendants' actions constitute a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, because they are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.

176.   The defendants' actions also constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "quick look" analysis because an observer with even a rudimentary understanding of economics could conclude that their actions would have an anticompetitive effect on consumers in the relevant market.

177.   The defendants' actions also constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the "Rule of Reason" because the facts and circumstances reveal that they have an adverse impact on competition that cannot be justified as a procompetitive measure.

{B4112082}

178.   The defendants' actions restrict, and are intended to restrict, the method of competing in the relevant market, thereby restricting the number of competitors and causing prices in the relevant market to rise, maintain, or stabilize above competitive levels.  Defendants have market power in the relevant market and can enforce their output-restricting agreement by using the legal process of the State of Alabama to preclude entrance into the relevant market or to restrict the method of competition in the relevant markets.  Defendants have used investigators of the State of Alabama to selectively locate persons—e.g., plaintiffs—who provide COVID-19 antibody testing to bring charges, cause the redirection of resources and force otherwise unnecessary expenditure, and enforce sanctions against any such individual or business, which results in harm to competition in the relevant market.  The individual defendants are actual or potential participants in the relevant market and have incentives to restrict competition in the relevant market, and no legitimate business justification exists for defendants' agreement.

179.   The defendants' actions evidence predatory intent to deprive pharmacists and pharmacies—or at least plaintiffs—of a fair opportunity to compete in the relevant market.  Through their actions, defendants intend to reduce the number of providers of pharmacy services in Alabama and cause for themselves and their favored providers in the relevant market the opportunity to provide such

services.  Defendants' actions do not enhance public health and safety in Alabama and do not serve any legitimate public purpose.

180.   The Board actions at issue were not supported by a clearly expressed state policy reflected in a relevant state statute at the time the actions were taken and, therefore, are preempted by Section 1 of the Sherman Act, 15 U.S.C. § 1.

181.   As a direct, proximate, and foreseeable result of the defendants' actions, plaintiffs have or will suffer damages and injury.

182.   Plaintiffs are entitled to sue for treble damages, costs of suit, including attorneys' fees, and prejudgment interest in accordance with 15 U.S.C. § 15.

183.   In addition to their claims for damages, plaintiffs are entitled to sue for injunctive relief pursuant to 15 U.S.C. § 26.

WHEREFORE, plaintiffs demand judgment against the defendants (1) for treble damages, costs of suit, attorneys' fees, and interest for violation of 15 U.S.C. § 1, per 15 U.S.C. § 15; (2) for injunctive relief prohibiting any further anticompetitive action by the Board per 15 U.S.C. § 26, including cost of suit and attorneys' fees; and (3) for such further, different, additional, and allied relief as the Court deems appropriate, including attorneys' fees, litigation expenses, and costs.

## COUNT THREE
## VIOLATION OF THE COMMERCE CLAUSE
### (All Defendants)

184.   Plaintiffs re-allege and incorporate paragraphs 1 through 183 as if fully set forth herein.

185.   The Commerce Clause of the United States Constitution, Article I, § 8 authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States...."

186.   The Commerce Clause prevents the defendants from enacting regulations that benefit in-state interests and burden out-of-state commerce— such as regulations which unreasonably or unduly interfere with interstate commerce.

187.   The Board's actions, which are *ultra vires* and/or illegal but pursued under color of state law, discriminate against interstate commerce by interfering with COVID-19 antibody testing, which is regulated by preemptive federal law, and selectively eliminating a legitimate source of information being provided by plaintiffs at reasonable cost to Alabamians.

188.   There is no legitimate local purpose that substantially justifies the actions to which the Board has subjected the plaintiffs.  Furthermore, the COVID-19 antibody testing by plaintiffs presented no risk to consumers.  The burden imposed on plaintiffs, customers, and test kit providers is excessive and provides no

benefit—especially when other similarly situated pharmacists have not been selectively prosecuted as have plaintiffs.

189.   As a result, defendants have and are and will continue to deprive plaintiffs of rights, privileges, and immunities secured by the Constitution and federal laws in violation of 42 U.S.C. § 1983.

190.   In addition to any compensatory damages, the Board members, in their individual capacities, are subject to punitive damages because their actions are malicious, wanton, and/or oppressive, recklessly and callously indifferent to the plaintiffs' rights by the institution and maintenance of an illegitimate *ultra vires* investigation and proceedings; therefore, the Board members' conduct is in no way objectively reasonable.

WHEREFORE, plaintiffs request judgment in their favor granting declaratory judgment under 28 U.S.C. §§ 2201 *et seq* and injunctive relief restraining the defendants' actions constituting violations of the Commerce Clause of the United States Constitution, and awarding plaintiffs compensatory and punitive damages pursuant to 42 U.S.C. § 1983, attorneys' fees pursuant to 42 U.S.C. § 1988(b), expenses of litigation, and costs.

## COUNT FOUR
## VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS OF LISA LEONARD AND THE DRUG STORE
### (All Defendants)

191.   Plaintiffs re-allege and incorporate paragraphs 1 through 190 as if fully set forth herein.

192.   Section 1 of the Fourteenth Amendment of the United States Constitution provides: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

193.   The right to engage in a profession is a property right.

194.   As a licensed pharmacist providing services to Alabama residents, Lisa Leonard possesses property interests in the ability to pursue her chosen profession, subject only to regulations that are rationally related to a legitimate government interest and, specifically in this case, properly published as such and within the BoP's authority and jurisdiction.  The Drug Store has a property interest, through its owners, Lisa and Craig Leonard in the ability to conduct a retail, full-service pharmacy business providing services to Alabama residents—again subject only to regulations rationally related to a legitimate governmental interest and, specifically

in this case, properly published and within the Board's authority and jurisdiction. Animus can never be a legitimate state interest. And, in any event, irrationality of government action alone is sufficient to justify injunction over such action. The Board did not publish any guidance or new regulation from March 1, 2020 to September 4, 2020 relating to any aspect of pharmacy care during the pandemic including the authority to offer COVID-19 antibody tests or the procedure for same.

195.   The Board's selective enforcement of non-existent strictures on COVID-19 antibody testing and allegations and threatened penalties regarding COVID-19 antibody testing, which the defendants have asserted under color of State law, deprive plaintiffs of liberty and property interests protected by the Due Process Clause by imposing restrictions on their ability to serve customers freely requesting tests. Such restrictions are not rationally related to any legitimate governmental interest within the Board's authority.

196.   Plaintiffs have the right to a fair hearing before an impartial tribunal on only such grounds as are properly within the jurisdiction of the tribunal and before a tribunal not tainted by the participation of market participants not subject to *active* state supervision. Defendants constitute a self-interested tribunal that will sit as judge, jury, and executioner of plaintiffs' property interests and constitutional rights.

197.   Unless defendants are enjoined from committing these constitutional violations, plaintiffs will suffer immeasurable and irreparable harm. In the absence

of an injunction, plaintiffs will lose the ability to practice pharmacy and operate as a retail pharmacy in Alabama at the hands of defendants engaged in illegal and *ultra vires* activities without due process of law and without any substantive guarantees of adequate redress.

198.   There is a substantial likelihood that defendants will deliberately deprive plaintiffs of their property and liberty interests in or associated with their license and permit, respectively, and their established good will, the monetary value of their profession and business, and a fair hearing without due process of law in violation of the federal Constitution and other applicable law.

199.   In addition to any compensatory damages, the Board members, in their individual capacities, are subject to punitive damages because their actions are malicious, wanton, and/or oppressive, recklessly and callously indifferent to the plaintiffs' rights by the institution and maintenance of an illegitimate *ultra vires* investigation and proceedings; therefore, the Board members' conduct is in no way objectively reasonable.

WHEREFORE, plaintiffs request judgment in their favor granting declaratory judgment pursuant to 28 U.S.C. §§ 2201 *et seq* and injunctive relief restraining the defendants' actions violative of the Due Process Clause of the United States Constitution, and awarding plaintiffs compensatory and punitive damages pursuant

to 42 U.S.C. § 1983, attorneys' fees pursuant to 42 U.S.C. § 1988(b), expenses of litigation, and costs.

## COUNT FIVE
## VIOLATION OF EQUAL PROTECTION CLAUSE AGAINST A "CLASS OF ONE"
### (All Defendants)

200.   Plaintiffs re-allege and incorporate paragraphs 1 through 199 as if fully set forth herein.

201.   The Equal Protection Clause, Section 1, of the Fourteenth Amendment to the U.S. Constitution requires that "No State shall…deny any person within its jurisdiction the equal protection of the laws."

202.   The Board's intentional selective prosecution and/or enforcement actions against Lisa Leonard and The Drug Store create a distinction between plaintiffs and other Alabama-licensed pharmacists and pharmacies, without a rational basis for such a distinction, in violation of the rights of plaintiffs under the Equal Protection Clause of the federal Constitution.

203.   The Equal Protection Clause does not allow a regulatory board to treat similarly situated persons differently unless the reason for doing so bears a rational relationship to a legitimate governmental interest.   Animus can never constitute legitimate state interest, nor can a desire to actually harm a particular individual or business.  In any event, *irrationality alone* is sufficient to require injunction of the regulatory action, and the lack of rational basis for the regulatory action evidences

the desire to harm and the link between the improper motive, the acts, and the harm caused to plaintiffs. *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000). No proof of any subjective impermissible motive is required.

204.   There is no rational basis for Alabama's distinction between other Alabama-licensed pharmacists and pharmacies who administer COVID-19 antibody tests and the plaintiffs. There is no rational basis for *any* of defendants' conscience-shocking actions. Accordingly, plaintiffs are being denied the equal protection of the law. The defendants' animus against the plaintiffs poisons the well and discredits any other explanations they might offer as mere pretext for their abuse of power and infliction of harm on the plaintiffs.

205.   Animus, vindictive action, and ill will such as the defendants are exhibiting is one of the core prohibitions of the equal protection clause. Plaintiffs are entitled to the protection of their rights and to professional regulation uncorrupted by personal animus. Unless defendants are enjoined from committing these violations of the Equal Protection Clause, as set forth in the Fourteenth Amendment, plaintiffs will continue to suffer great and irreparable harm. In the absence of an injunction, plaintiffs will lose the ability to practice pharmacy and provide pharmacy services based on allegations regarding testing that are not even properly subject to the Board's jurisdiction and are being selectively prosecuted by the Board. The defendants' personal, private biases against the plaintiffs will have

been given effect, and cover, by the law. Public laws do not exist to express and enforce private bias.

206. In addition to any compensatory damages, the Board members, in their individual capacities, are subject to punitive damages because their actions are malicious, wanton, and/or oppressive, recklessly and callously indifferent to the plaintiffs' rights by the institution and maintenance of an illegitimate *ultra vires* investigation and proceedings; therefore, the Board members' conduct is in no way objectively reasonable.

WHEREFORE, plaintiffs request judgment in their favor granting declaratory judgment under 28 U.S.C. §§ 2201 *et seq* and injunctive relief restraining defendants' denial to plaintiffs the equal protection of the law, and awarding plaintiffs compensatory and punitive damages pursuant to 42 U.S.C. § 1983, attorneys' fees pursuant to 42 U.S.C. § 1988(b), litigation expenses, and costs.

## COUNT SIX
### PREDATORY AND RETALIATORY ENFORCEMENT—42 U.S.C. § 1983

207. Plaintiffs re-allege and incorporate paragraphs 1 through 206 as if fully set forth herein.

208. Abundant evidence of improper, retaliatory motive exists in this case. The defendants' impermissible motives are demonstrated by the historical background, the specific sequence of events leading to the charges made against the plaintiffs, and the defendants' substantial departure from their granted authority.

{B4112082}                                     76

209.   It is beyond debate that the defendants' actions against the plaintiffs are purely, deliberately, and intentionally retaliatory.  Notwithstanding the resolution 14 years ago of the "Glenn Wells gun incident" by way of an order entered in the same biased, market-participant-judged forum with which plaintiffs long-ago fully complied along with the fact that they have had no further incidents of note, defendants have raised the "Glenn Wells gun incident" again like an overwrought vampire from the grave.  That gun incident has nothing to do with COVID-19 antibody testing (nor should the defendants).  The fact is that all those years ago Glenn Wells carried a gun (and may still—perhaps family pharmacies in small towns are dangerous places), and, when he pulled the gun on Lisa Leonard at The Drug Store (or did not), there was no one else present but Glenn Wells and Lisa Leonard. Yet, it is apparent, from the retaliatory action being taken against plaintiffs by the defendants, that the defendants have adopted Glenn Wells' vendetta as their own by making the long-resolved "Glenn Wells gun incident" an issue again in the context of a pretextual, *ultra vires*, anticompetitive, and illegal prosecution the sole purpose of which is to drive plaintiffs from the business of pharmacy.

210.   Retaliatory enforcement by regulatory agencies and their employees, agents, and members is not, unfortunately, unique to this case.  Courts have dealt with such matters before. *See, e.g., CarePartners LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008); *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008);

*Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152-153 (2d Cir. 2006); *Blue v. Koren*, 72 F.3d 1075, 1082 (2d Cir. 1995).

211.   While regulatory agencies need enforcement powers to regulate health care effectively in the interests of maintaining a high quality of care, how those regulatory powers are used must be subject to scrutiny.  When the powers of a state agency are in the hands of market participants—especially those exceeding their regulatory mandate—that scrutiny must be *active* and independent of the market participants—and particularly when there is stark evidence of bias, personal animus, and the prosecution of a vendetta being a factor in the enforcement action.  The federal court becomes the proper forum to vindicate the targets of the Board's predatory and retaliatory actions and to protect and preserve plaintiffs' constitutional and other rights by providing an effective avenue of relief for them instead of allowing them to be subjected to unjust prosecution by the Board.

212.   Defendants' actions are *ultra vires*, anticompetitive, and factually and legally baseless.  An obvious causal connection exists between the defendants' retaliatory motive and its retaliating prosecution.

213.   If the defendants' actions are not enjoined, plaintiffs will continue to suffer a deprivation of constitutional rights without a basis for meaningful appeal and redress, which contravenes the federal Constitution and 42 U.S.C. § 1983.

214.   Defendants' acts have been undertaken with a malicious intent in callous disregard of the plaintiffs' federally protected rights thus making punitive damages appropriate against the defendants in addition to compensatory damages.

215.   In addition, there is every reason to expect that defendants will attempt to punish plaintiffs for exercising their rights to litigation of this case.

216.   In addition to any compensatory damages, the Board members, in their individual capacities, are subject to punitive damages because their actions are malicious, wanton, and/or oppressive, recklessly and callously indifferent to the plaintiffs' rights by the institution and maintenance of an illegitimate *ultra vires* investigation and proceedings; therefore, the Board members' conduct is in no way objectively reasonable.

WHEREFORE, plaintiffs request judgment in their favor granting declaratory judgment under 28 U.S.C. §§ 2201 *et seq* and injunctive relief restraining defendants' illegal actions, and awarding plaintiffs compensatory and punitive damages pursuant to 42 U.S.C. § 1983, attorneys' fees pursuant to 42 U.S.C. § 1988(b), litigation expenses, and costs.

## RELIEF REQUESTED

Plaintiffs seek the following relief as well as all other equitable and/or legal relief to which they are entitled:

1.     A preliminary and permanent injunction prohibiting the defendants from further adverse action against plaintiffs and from proceeding with the Board hearing;

2.     A declaration (a) that the Board has no authority to regulate COVID-19 antibody testing in the manner sought in the statement of charges because the Board's use of the statutes and regulations cited exceeds its authority and is *ultra vires*, violative of due process, and anticompetitive and (b) that the Board members individually do not have immunity for anticompetitive actions because there is no active state regulatory oversight of the Board's decisions;

3.     A ruling, based on *North Carolina Dental Bd.*, that the defendants cannot sit in judgment of other market participants without complying with the requirements of the antitrust laws, including, but not limited to, the requirement of "active supervision";

4.     A declaration that any legitimate authority, if any, of defendants must be circumscribed to its proper bounds and a declaration of what those proper bounds are;

5.     A declaration that personal animus in Board proceedings is an illegal and improper motivation for Board actions;

6.    A declaration that any charges proffered by the Board in any way pertaining to COVID-19 antibody testing against Lisa Leonard and The Drug Store are invalid and of no force and effect;

7.    An order to the Board to dismiss the administrative proceedings against Lisa Leonard and The Drug Store;

8.    A judgment in plaintiffs' favor, including such treble, compensatory, and punitive damages as a jury, in its discretion, may award;

9.    An award of plaintiffs attorneys' fees as allowable by statute, including, without limitation, under 15 U.S.C. § 15 and 42 U.S.C. § 1988, and attorneys' fees and costs as authorized by 28 U.S.C. § 1920; and

10.    That the Court issue and award plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

Richard E. Davis (ASB-6685-A58R)
Tabor R. Novak, III (ASB-3580-B60N)

*Attorneys for Plaintiffs*

<u>Of Counsel</u>

Alicia M. Harrison (ASB-9024-D53A)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone:  (205) 868-6000
Facsimile:  (205) 868-6099
Email:  rdavis@starneslaw.com
        aharris@starneslaw.com
        tnovak@starneslaw.com

## **Jury Demand**

Plaintiffs demand trial by struck jury of all issues so triable.


Of Counsel

## CERTIFICATE OF SERVICE

I hereby certify that this Complaint for Preliminary and Permanent Injunction, Declaratory Judgment, and Other Allied Relief Including Treble, Compensatory, and Punitive Damages has been filed with the Clerk of the Court for the U.S. District Court, Middle District of Alabama.  A copy is being served as indicated below:

*By Certified Mail/Return Receipt Requested to:*
The Alabama State Board of Pharmacy
111 Village Street
Birmingham, AL 35242

*By Certified Mail/Return Receipt Requested to:*
Brenda Denson
2308 Maury Place
Birmingham, AL 35242

*By Certified Mail/Return Receipt Requested to:*
Chris Phung
604 Keeneland Court
Montgomery, AL 36109

*By Certified Mail/Return Receipt Requested to:*
Robert M. Colburn
930 Arundell Street
Tuscaloosa, AL 35406

*By Certified Mail/Return Receipt Requested to:*
Christy Garmon
425 Brookview Drive
Talladega, AL 35160

*By Certified Mail/Return Receipt Requested to:*
Gary Mount
P.O. Box 3073
Auburn, AL 36831-3073

{B4112082}

In addition, a copy of this document has been sent by U.S. Mail to the following:

James S. Ward, Esq.
Ward & Cooper, LLC
2100 South Bridge Parkway
Suite 580
Birmingham, Alabama 35209


This 8th day of September, 2021.

Of Counsel