IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LISA HILL LEONARD, *et al.*,      )
                                  )
    Plaintiffs,                   )
                                  )
v.                                ) CIVIL ACT. NO. 3:21-cv-596-ECM
                                  )              [WO]
THE ALABAMA STATE BOARD OF        )
PHARMACY, *et al.*,               )
                                  )
    Defendants.                   )

## MEMORANDUM OPINION and ORDER

## I.  INTRODUCTION

Now pending before the Court are Plaintiffs' amended motion for preliminary injunction (doc. 33) and Defendants' motion to dismiss the amended complaint (doc. 39). Plaintiffs Lisa Hill Leonard and Leonard Drugs Inc. d/b/a The Drug Store's (collectively, "Plaintiffs") seek to enjoin the Alabama State Board of Pharmacy (the "Board") and the Board's members—Brenda Denson, Chris Phung, Robert Colburn, Christy K. Harmon, and Gary Mount—in their official and individual capacities (collectively, "Defendants"), from commencing a disciplinary hearing before the Board,[1] and from "taking any adverse action against Lisa Leonard's [pharmacy] license and The Drug Store's permit" until a trial on the merits can be held, (doc. 33 at 6).  The disciplinary hearing is for charges brought

_____

[1] The Board hearing was set for January 18, 2022 but has been continued generally to a date to be determined.

by the Board concerning, among other things, the manner in which the Plaintiffs administered COVID-19 antibody tests to The Drug Store's patients.  The Defendants seek to dismiss the amended complaint in its entirety.

The Plaintiffs filed this lawsuit on September 8, 2021. (Doc. 1).  In their corrected amended complaint (hereinafter "amended complaint"), (doc. 45),[2] the Plaintiffs allege that the Defendants' efforts to hold the aforementioned disciplinary hearing violates the Plaintiffs' constitutional and statutory rights.  Specifically, the Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 and 15 U.S.C. § 1 (the "Sherman Act"), alleging that the Defendants' actions are illegal, *ultra vires*, and/or contrary to and/or preempted by federal law, specifically the Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 243 *et seq.* (the "PREP Act") (Count 1); the Defendants violated federal antitrust laws (Count 2); the Defendants violated the Dormant Commerce Clause (Count 3); the Defendants deprived the Plaintiffs of procedural and substantive due process in violation of the Fourteenth Amendment (Count 4); the Defendants violated the Equal Protection Clause of the Fourteenth Amendment (Count 5); and the Defendants have engaged in predatory and retaliatory enforcement (Count 6).  The Plaintiffs seek a declaratory judgment, injunctive relief, damages, and attorney's fees.

---

[2] On November 4, 2021, the Plaintiffs filed an amended complaint. (Doc. 32).  On November 10, 2021, the Plaintiffs filed an unopposed motion for leave to substitute a page of the amended complaint that, according to the Plaintiffs, contained an incorrect date. (Doc. 36). On November 18, 2021, the Court granted the Plaintiffs' motion and directed them to file a corrected amended complaint containing the corrected page. (Doc. 38).  In its Order, the Court explained that the corrected amended complaint will operate as a substitute for the amended complaint which contained the error, (doc. 32), although it will have a separate docket entry and a new document number, and that it shall not be construed as a second amended complaint. (Doc. 38).

Both motions are fully briefed, and the Court held a hearing on the amended motion for preliminary injunction on December 15, 2021.  For the reasons that follow, the Defendants' motion to dismiss (doc. 39) is due to be GRANTED, and the Plaintiffs' amended motion for preliminary injunction (doc. 33) is due to be DENIED.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56.  This pleading

standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citation omitted).  Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citation omitted).

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, may be a factual or facial attack on subject matter jurisdiction. *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002).  A factual attack permits the district court to weigh evidence outside the pleadings to satisfy itself of the existence of subject matter jurisdiction in fact. *Id.* at 1237. However, a facial attack merely questions the sufficiency of the pleading. *Id.*  Under a facial attack, as here, the district court accepts the plaintiff's allegations as true and need not look beyond the face of the complaint to determine whether the court has subject matter jurisdiction. *Id.*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The Plaintiffs are entitled to a preliminary injunction if they demonstrate: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to them outweighs the harm the injunction would cause the Defendants; and (4) that the injunction would not be adverse to the public interest. *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021).  A preliminary injunction is "'not to be granted unless the movant clearly established the "burden of persuasion"' for each prong of the analysis." *America's Health Ins. Plans v. Hudgens*, 742

F.3d 1319, 1329 (11th Cir. 2014) (citation omitted).  The Plaintiffs, as the movants, must satisfy their burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

## IV.  FACTS[3]

### A. Statutory Background

#### 1. State

The Alabama Legislature has declared that "[t]he practice of pharmacy and the management and operation of pharmacies . . . affect[s] the public health, safety, and welfare of the people of Alabama, and thereby [are] subject to regulation and control in the public interest." Ala. Code § 34-23-2.  It is also "a matter of public interest and concern . . . that pharmacies be managed in such a manner as to protect the public, and all provisions of this chapter shall be liberally construed to carry out these objects and purposes." *Id.*  The Legislature vests the Alabama State Board of Pharmacy "with the authority to carry out the purposes of and enforce this chapter [concerning pharmacists and pharmacies]." *Id.* § 34-23-90(a).  The Legislature further requires that Board members "be licensed pharmacists who have been licensed in this state for a minimum of five years and who are actively engaged in the practice of pharmacy or pharmacy administration, or both." *Id.*

---

[3] This recitation of the facts is based upon the Plaintiffs' amended complaint and the exhibits attached thereto.  The Court recites only the facts pertinent to resolving the Defendants' motion to dismiss.  At this stage of the proceedings, for purposes of ruling on the motion, the facts alleged in the amended complaint, and the reasonable inferences drawn therefrom, are set forth in the light most favorable to the Plaintiffs.

The Board has the power and duty "[t]o investigate violations of this chapter or any other law pertaining to the practice of pharmacy that may come to the knowledge of the board and institute or cause to be instituted before the board or in a proper court appropriate proceedings in connection therewith." *Id.* § 34-23-92(7).  The Board also has the power and duty "[t]o investigate alleged violations of this chapter or any rule or regulation published by the board and conduct hearings to revoke, suspend, or probate any license or permit granted by the board under this chapter." *Id.* § 34-23-92(12).

### 2.  Federal

The PREP Act authorizes the Secretary of Health and Human Services ("HHS") to "make[] a determination that a disease or other health condition or other threat to health constitutes a public emergency." 42 U.S.C. § 247d-6d(b)(1).  If the Secretary makes such a determination, the Secretary "may make a declaration . . . recommending, under conditions as the Secretary may specify, the manufacture, testing, development, distribution, administration, or use of one or more covered countermeasures." *Id.*  If the Secretary issues a declaration, then a "covered person," as defined by the statute, "shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." *Id.* § 247d-6d(a)(1).  "Covered countermeasure" is defined as a "qualified pandemic or epidemic product"; "security countermeasure"; drug, biological product, or device; or "respiratory protective device." *Id.* § 247d-6d(i)(1).

6

The PREP Act also contains the following preemption provision:

> During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
>
> **(A)** is different from, or is in conflict with, any requirement applicable under this section; and
>
> **(B)** relates to the design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act.

*Id.* § 247d-6d(b)(8).

In March 2020, the Secretary issued a declaration under the PREP Act regarding the COVID-19 pandemic. Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,198 (Mar. 17, 2020).  The declaration defines a covered countermeasure as any "antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19." *Id.* at 15,202.  On April 8, 2020, HHS issued guidance authorizing licensed pharmacists to "order and administer COVID-19 tests, including serology [antibody] tests, that the Food and Drug Administration (FDA) has authorized." U.S. Dep't of Health & Hum. Servs., Guidance for Licensed Pharmacists, COVID-19 Testing, and Immunity under the PREP Act (Apr. 8, 2020).  On April 17, 2020,

the HHS Office of General Counsel released an advisory opinion regarding the PREP Act, clarifying that antibody tests constitute "covered countermeasures" under the March 17, 2020 declaration, and also confirming that pharmacists are "covered persons" and are afforded the PREP Act's immunity. U.S. Dep't of Health & Hum. Servs., Advisory Opinion on the Public Readiness and Emergency Preparedness Act and the March 17, 2020 Declaration under the Act (Apr. 17, 2020, as modified on May 19, 2020).

### B.  Lisa Leonard and The Drug Store

Lisa Leonard is an Alabama-licensed pharmacist and the supervising pharmacist of The Drug Store, a retail pharmacy located in Auburn, Alabama.  Mrs. Leonard and her husband, Craig Leonard, operate The Drug Store jointly.  The Drug Store employs three pharmacists, three pharmacy technicians, an officer manager, two students, and one delivery person.

On April 14, 2020, The Drug Store began offering COVID-19 antibody tests.  On April 16, 2020, Lisa Leonard purchased certain "rapid" antibody tests.  On May 11, 2020, The Drug Store began using an antibody test manufactured by Healgen Scientific. According to the amended complaint, neither Lisa Leonard nor The Drug Store told any customers to whom antibody tests were administered that the customer was receiving a COVID-19 "diagnosis."  Additionally, the Plaintiffs allege that they regularly refused to

test patients who were symptomatic[4] and recommended that such patients obtain a diagnostic test elsewhere. Patients receiving an antibody test at The Drug Store completed a form bearing a disclaimer that reads in relevant part: "Negative results do not rule out SARS-CoV-2 infection . . . . Results from antibody testing should not be used as the sole basis to diagnosis [sic] or exclude SARS-CoV-2 infection or to inform infection status." (Doc. 45 at 27; doc. 45-13 at 2). Patients completed this form for over 75% of total antibody tests performed at The Drug Store and for all antibody tests performed there after June 26, 2020.

On July 24, 2020, Charles "Chuck" Beams called The Drug Store purporting to be a potential customer who needed an antibody test. Mr. Beams is a pharmacist employed by East Alabama Medical Center ("EAMC"), which was also offering COVID-19 antibody tests. Mr. Beams spoke to JoAnna Taylor, one of The Drug Store's pharmacy technicians. Ultimately Ms. Taylor told Mr. Beams to wait to take the test.

On July 27, 2020, Mr. Beams called The Drug Store twice. The first time, he spoke to Mrs. Leonard, who also told him to wait to take the test. Mr. Beams called back a short while later. He first asked to speak to JoAnna Taylor and then to Craig Leonard. Mr. Beams and Mr. Leonard spoke briefly, and then Mr. Beams again spoke to Mrs. Leonard. In this final call, Mr. Beams identified himself for the first time as an EAMC pharmacist.

---

[4] However, elsewhere in the amended complaint the Plaintiffs allege that Lisa Leonard "made it clear, repeatedly, that customers should *not* get tested *unless* they were symptomatic." (Doc. 45 at 41, para. 97 (emphases in original)). Additionally, in an April 27, 2020 television interview, the reporter told viewers, "[Lisa] Leonard says anybody can get the test but right now there is a limited supply and suggests if you're not currently showing symptoms and are instead curious, wait and you'll save some money." (*Id.*).

He allegedly stated he had heard that The Drug Store's antibody test contradicted the results of EAMC's antibody test, which "was causing muddy waters." (Doc. 45 at 29, para. 71). Mr. Beams also allegedly stated that EAMC's test was "'the word of God' and that EAMC was potentially eligible for awards and funding for its work." (*Id.*). Mr. Beams allegedly told Mrs. Leonard to stop administering antibody tests at The Drug Store and further stated that she had not heard the end of "this."

The same day (July 27, 2020), Mr. Beams emailed the Alabama Department of Public Health, the Alabama Hospital Association, and the Board's executive secretary, Donna Yeatman, with the subject line "EAMC—Help with COVID testing concerns." (*Id.* at 30, para. 72). According to the email, which is attached to the amended complaint, EAMC ran a COVID-19 call center that received an average of 750 calls per day. In the email, Mr. Beams stated that numerous patients had called EAMC's call center "confused" after receiving results from The Drug Store's antibody test. Mr. Beams further stated that "we feel quite certain that many are going to [The Drug Store] to receive 'the COVID test' not knowing that the test is not conclusive for active infection." (Doc. 45-15 at 2).

From July 28 to August 7, 2020, Mr. Beams exchanged emails with Sean Malloy, one of the Board's investigators. In one email, Mr. Beams relayed that EAMC had received emails from patients saying that The Drug Store staff were discrediting EAMC's COVID-19 testing procedures as well as the procedures of local pediatricians. Additionally, in response to Mr. Beams' request for an update, Mr. Malloy wrote: "If all goes the way we plan, then I believe we will stop any further issues from The Drug Store." (Doc. 45-19).

On July 28, 2020, Board investigator Glenn Wells called Lisa Leonard regarding the antibody testing complaint from Mr. Beams.  The amended complaint does not allege the substance of this conversation.  However, the amended complaint explains that this was not the first encounter between Mr. Wells and Mrs. Leonard.  In 2005, Mr. Wells visited The Drug Store to investigate another matter.  During that investigation, Mr. Wells and Mrs. Leonard had an interaction wherein Ms. Leonard claimed that Mr. Wells pulled a gun on her, while Mr. Wells denied doing so.

On August 26, 2020, Mr. Malloy and Mr. Wells appeared at The Drug Store unannounced.  According to the amended complaint, Mr. Wells asserted that the tests administered by The Drug Store were inaccurate on the same grounds as Mr. Beams.  Mr. Wells gave Mrs. Leonard copies of guidance on antibody tests.  Neither Mr. Malloy nor Mr. Wells instructed Mrs. Leonard to stop administering antibody tests.

On September 2, 2020, Lisa Leonard and two employees of The Drug Store met with the Board.  On September 4, 2020, The Drug Store stopped administering COVID-19 antibody tests "without having been directed or ordered to do so by the Board, but because of the intimidation, threatening actions, and bullying by the Board's investigators and staff." (Doc. 45 at 35, para. 83).

On September 23, 2020, Board investigator Mark Delk visited The Drug Store and asked Lisa and Craig Leonard to provide handwritten statements regarding the 2005 incident wherein Mr. Wells allegedly pulled a gun.  Believing they had no choice, the Leonards provided the requested statements, but they were not allowed to make copies nor

11

were given copies.  The Board, its investigators, and its counsel knew that the Leonards and The Drug Store were represented by counsel at the time.

The Plaintiffs also allege that, at some unspecified time, at least two individuals believed to be immediate relatives of Board members received COVID-19 antibody tests at The Drug Store.  The Plaintiffs further allege that the familial relationship between the Board and these potential witnesses suggests the appearance of impropriety and/or bias on the part of the Board.

On March 9, 2021, the Board issued a 37-count Statement of Charges against Lisa Leonard and The Drug Store and ordered them to appear for a hearing on June 15, 2021.[5] The Statement of Charges accuses Lisa Leonard and The Drug Store of administering COVID-19 antibody tests which they represented would provide a COVID-19 diagnosis when, in fact, such a representation was false, deceptive, and/or misleading; telling patients they could return to work or school, travel, or get medical treatment based on their test results; allowing JoAnna Taylor, a pharmacy technician, to administer COVID-19 antibody tests; not using a Sharps container for lancets used in administering the antibody tests; not using a new, clean alcohol wipe for each customer; not recording allergy information for each customer; and failing to use Personal Protective Equipment while administering the COVID-19 antibody tests.  The Statement of Charges also accuses Mrs. Leonard of falsely representing to third parties that Mr. Wells had brandished a gun at The Drug Store in 2005.

---

[5] In their reply in support of their motion for preliminary injunction, the Plaintiffs assert that the hearing officer subsequently continued the hearing at the Plaintiffs' request.

The Statement of Charges further specifies that the purpose of the hearing is to determine why Lisa Leonard's license to practice pharmacy should not be revoked, suspended, or placed on probation, or a monetary penalty imposed, and why the permit to operate The Drug Store should not be revoked, suspended, or placed on probation, or a monetary penalty imposed. Lisa Leonard and The Drug Store filed answers denying the charges.

On August 23, 2021, the Board moved to amend the Statement of Charges. On August 30, 2021, the hearing officer amended the Statement of Charges, expanding the total charges to fifty. Counts 38–50 accuse Lisa Leonard and The Drug Store of administering COVID-19 antibody tests without a proper CLIA certification; using a false "NDC number" on the labels for each test administered; and administering the Healgen COVID-19 antibody tests by collecting fingertip specimens, which was not recommended by the manufacturer. Lisa Leonard and The Drug Store filed answers denying the amended charges.

The Plaintiffs allege that the Board's intent in bringing the charges and pursuing the hearing is to drive the Plaintiffs out of the market to allow "favored entities" to absorb The Drug Store's market share. (Doc. 45 at 61, para. 138). They also allege that the Board's charges have anticompetitive effects on the market by reducing citizens' access to COVID-19 antibody testing, decreasing access to information, and decreasing the availability of antibody testing, which increases the cost. They allege that, without competition from the Plaintiffs, licensed pharmacists and pharmacies—including Board members—will be able to charge higher prices to consumers for the same services. According to the Plaintiffs, the

13

relevant market is the market for pharmacists and pharmacies in Auburn-Opelika, Lee County, and Alabama, and the relevant products/services are COVID-19 antibody tests.

In their amended complaint, the Plaintiffs bring six claims against the Board and the Board members in their individual and official capacities. In Count 1, the Plaintiffs claim that the Defendants' actions are illegal and *ultra vires*, and contrary to or preempted by federal law. According to the Plaintiffs, the Defendants' actions are illegal and *ultra vires* because the Defendants have no authority under Alabama law to regulate COVID-19 antibody testing. The Plaintiffs further contend that the PREP Act grants them immunity from the Board's charges, and also that the charges are preempted by the PREP Act. The Plaintiffs seek declaratory and injunctive relief, attorney's fees, and costs against the Board and its members in their official capacities. In Count 2, the Plaintiffs claim that the Defendants violated federal antitrust laws, specifically Section 1 of the Sherman Act, 15 U.S.C. § 1. The Plaintiffs seek injunctive relief, attorney's fees, and costs against the Board and its members in their official capacities, and treble damages, attorney's fees, and costs against the Board members in their individual capacities. In Count 3, the Plaintiffs claim that the Defendants violated the Dormant Commerce Clause. In Count 4, the Plaintiffs claim that the Defendants violated the Plaintiffs' procedural and substantive due process rights. In Count 5, the Plaintiffs claim that the Defendants violated the Equal Protection Clause of the Fourteenth Amendment on a "class of one" theory, alleging that the Plaintiffs, without any rational basis, were treated differently than other Alabama pharmacies and pharmacists who administer COVID-19 antibody tests. Finally, in Count 6, the Plaintiffs

14

claim that the Defendants' actions constitute predatory and retaliatory enforcement.[6]   In Counts 3–6, the Plaintiffs seek injunctive relief, attorney's fees, and costs against the Board and its members in their official capacities, and they seek compensatory damages, punitive damages, attorney's fees, and costs against the Board members in their individual capacities.

## V.  DISCUSSION

### A. Motion to Dismiss

The Defendants move to dismiss the amended complaint on numerous grounds. They contend that the amended complaint is an improper shotgun pleading; that the Court should abstain from all but one of the Plaintiffs' claims; that the Board and its members in their official capacities have sovereign immunity from claims for money damages, and thus the Court lacks subject matter jurisdiction over those claims; that the Plaintiffs fail to state a claim upon which relief can be granted on all six counts; and that the Board members in their individual capacities are entitled to qualified immunity from the Plaintiffs' constitutional claims for damages.

As explained further below, the Court finds that all individual capacity claims are due to be dismissed for failure to state a claim, the antitrust claim against the Board and its members in their official capacity is due to be dismissed for failure to state a claim, and the

---

[6] The Plaintiffs purport to bring Count 6 pursuant to 42 U.S.C. § 1983.  In the amended complaint, the Plaintiffs suggest that this claim is based on the Due Process Clause of the United States Constitution. (Doc. 45 at 88).  However, in response to the Defendants' motion to dismiss, the Plaintiffs contend that Count 6 implicates the First, Fourth, and Fifth Amendments. (Doc. 47 at 60–62). Ultimately, however, the Court's conclusions remain the same regardless of the precise constitutional provision(s) on which Count 6 is based.

Court should abstain from considering the Plaintiffs' remaining official capacity claims for declaratory and injunctive relief.[7]   Because the Court has determined that the claims are due to dismissed on these grounds, the Court pretermits discussion of the other grounds for dismissal urged by the Defendants.

### 1. Individual Capacity Claims

The Court concludes that the Plaintiffs fail to state a plausible claim for relief against the Board members in their individual capacities.  The amended complaint contains no allegations supporting any claim against the individual Board members because it contains no allegations regarding what any individual Board member did or said.  One allegation arguably targets individual Board members: the allegation that "at least two individuals who are believed to be immediately related to Board members sought to be and were voluntarily tested for COVID-19 antibodies at The Drug Store." (Doc. 45 at 67, para. 163). However, the amended complaint does not reveal the specific Board members to which the Plaintiffs refer in this allegation.  The Board members' names appear in the amended complaint only twice: in the caption and in the section identifying the parties.  The amended complaint's remaining references to the Board are to the Board as a global entity.  At the December 15, 2021 hearing, the Plaintiffs' counsel conceded that there are no allegations directed at any individual Board members, and counsel stated that there was no way to

---

[7] Additionally, the Court finds that the Defendants' sovereign immunity argument is misplaced. The amended complaint makes clear, and the Plaintiffs concede in their briefing, that the Plaintiffs seek money damages only from the Board members in their individual capacities and not from the Board or its members in their official capacities.  Thus, there is no sovereign immunity problem.

distinguish between the Board individually and officially without discovery.  But while Rule 8 requires only a "short and plain statement of the claim" showing entitlement to relief, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.  Given the absence of allegations relating to the individual Board members, the Plaintiffs have failed to show "more than a sheer possibility" that the Board members, in their individual capacities, "ha[ve] acted unlawfully." *See id.* at 678.  Accordingly, the claims against the Board members in their individual capacities are due to be dismissed with prejudice.

### 2. Antitrust Claim

The Defendants also contend that the Plaintiffs fail to state a claim under Section 1 of the Sherman Act.  Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.  Despite the statute's broad language, the Supreme Court "has long recognized that Congress intended to outlaw only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added).  A restraint violates Section 1 if it is per se unreasonable or fails the "rule of reason" test. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

"We start with the general assumption that the rule of reason applies." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016).  Per se violations of Section 1 "are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition," such as "horizontal price fixing among competitors,

17

group boycotts, and horizontal market division." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010) (Tjoflat, J.).   While the Plaintiffs allege in conclusory fashion that the Defendants' actions are per se unreasonable, the facts alleged do not fit into any of the categories listed above.   Additionally, the Plaintiffs do not allege or argue that this case fits into another class of practices "whose character is well understood and that almost always harm competition." *See id.*   Thus, the Court will turn to the rule of reason analysis.

In the Eleventh Circuit, a Section 1 claim analyzed under the rule of reason requires the plaintiff to show "(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004) (footnote omitted) (citation omitted).   "In alleging 'the anticompetitive effect of the defendant's conduct,' an antitrust plaintiff must show harm to competition rather than to competitors." *Id.*   To show an anticompetitive effect on the market, the plaintiff "may establish either (1) that the restraint had an 'actual detrimental effect' on competition, or (2) that the restraint had the potential for genuine anticompetitive effects and that the conspirators had market power in the relevant market." *Procaps S.A.*, 845 F.3d at 1084.   "The plaintiff has the burden of demonstrating damage to competition with 'specific factual allegations.'" *Jacobs*, 626 F.3d at 1339 (citation omitted).   To show the potential for anticompetitive effects, "the plaintiff must define the relevant market and

establish that the defendants possessed power in that market." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996).

The Plaintiffs' theory is that the Defendants sought to drive the Plaintiffs out of the market by bringing the disciplinary charges against them, and that eliminating the Plaintiffs from the market will benefit the Defendants while burdening consumers.  However, the Plaintiffs fail to plausibly allege actual damage to competition.  The Plaintiffs allege that, without competition from the Plaintiffs, the Defendants will be able to charge higher prices to consumers for the same services.  To be anticompetitive, the challenged practice must raise prices "above competitive levels." *Jacobs*, 626 F.3d at 1339 (citation omitted).  Here, however, "beyond the bald statement" that the Defendants will be able to charge consumers higher prices, nothing in the amended complaint alleges facts which show "the competitive level above which [the Defendants'] allegedly anticompetitive conduct artificially raised prices." *Id.*  Similarly, while the Plaintiffs allege that the Board's charges reduce consumers' access to antibody testing and decrease access to information in the relevant market, the Plaintiffs fail to allege facts regarding the competitive level above which the Defendants' allegedly anticompetitive conduct artificially reduced access to services or information.  In other words, the Plaintiffs fail to allege the "baseline" competitive level against which the Court must judge the Defendants' actions.  In sum, the Plaintiffs' vague allegations, devoid of any detail, are speculative and fall short of the requisite "specific factual allegations" demonstrating harm to competition. *See id.* (citation omitted).

19

Nor have the Plaintiffs plausibly alleged the potential for genuine adverse effects on competition. "At a minimum, this requires a plaintiff to 'define the relevant market and establish that the defendants possessed power in that market.'" *Spanish Broad. Sys.*, 376 F.3d at 1073. "After those threshold requirements, [the Plaintiffs] then had to make 'specific allegations linking market power to harm to competition in that market.'" *Jacobs*, 626 F.3d at 1339 (quoting *Spanish Broad. Sys.*, 376 F.3d at 1073). While they defined the relevant market, the Plaintiffs fail to plausibly allege that the Defendants possess market power. "Market share is frequently used in litigation as a surrogate for market power." *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983). The Plaintiffs do not allege what market share the Board members possess, individually or collectively. *Cf. Jacobs*, 626 F.3d at 1340 (explaining that plaintiff's allegation that defendant had "80–90% of sales" in the relevant market was sufficient to show market power; plaintiff nonetheless failed to show potential harm to competition because plaintiff failed to link defendant's market power to harm to competition). Moreover, the Plaintiffs' allegation that "Defendants have market power in the relevant market" is conclusory and nothing more than a recitation of an element of the cause of action, which is insufficient. *See Iqbal*, 556 U.S. at 678. Because they fail to plausibly allege the "threshold requirement" that the Defendants possess market power, *see Jacobs*, 626 F.3d at 1339, the Plaintiffs necessarily fail to plausibly allege the potential for genuine adverse effects on competition.

Accordingly, the Court finds that the Plaintiffs have failed to state a plausible Section 1 claim against the Board and its members in their official capacities.[8]

### 3. Official Capacity Claims for Declaratory and Injunctive Relief

The Defendants urge the Court to abstain from the remaining claims under *Younger v. Harris*, 401 U.S. 37 (1971).  In *Younger*, the Supreme Court "held that absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364 (1989) (hereinafter "*NOPSI*").  This holding was based on principles of comity and equity. *Id.*  The Supreme Court has since applied *Younger* to "civil enforcement proceedings" and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 368.  If the case falls into one of those three categories, the court must determine whether to abstain by considering the "*Middlesex* factors": "*first*, do [the proceedings] constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).  The satisfaction of the *Middlesex* factors alone is not sufficient to justify *Younger*

---

[8] The Plaintiffs also argue that the Defendants violated Section 1 under the "quick look" analysis.  However, the Court is not persuaded that the quick look analysis is applicable here.  Quick look is an abbreviated rule-of-reason analysis and is proper only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).  The Plaintiffs do not meaningfully argue how this case fits within the standard articulated by the Supreme Court.  Alternatively, because the Plaintiffs have failed to plausibly allege a Section 1 claim under the full-blown rule of reason analysis, they have also failed to state a claim under the quick look analysis.

abstention. *See Sprint Commc'ns v. Jacobs*, 571 U.S. 69, 81 (2013) (explaining that the *Middlesex* factors are "not dispositive").   Rather, courts apply the factors only after determining that the case falls into one of the categories identified by the Court in *NOPSI*. *See id.*

The Board hearing is plainly not a "criminal prosecution."  It also does not involve an order that is uniquely in furtherance of the state courts' ability to perform their judicial functions, such as a civil contempt order. *See Juidice v. Vail*, 430 U.S. 327, 336 & n.12 (1977).  Thus, *Younger* abstention may be appropriate only if the Board hearing is a "civil enforcement proceeding" that is "'akin to a criminal prosecution' in 'important respects." *Sprint Commc'ns*, 571 U.S. at 79.   "Such enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act," and "a state actor is routinely a party to the state proceeding and often initiates the action." *Id.*   Moreover, "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Id.* at 79–80.

This case involves the type of civil enforcement proceeding to which *Younger* has been applied.  The Board hearing was initiated to sanction the Plaintiffs for their alleged violations of Alabama law governing pharmacists and the practice of pharmacy. Additionally, the Board, a state actor, is a party to the hearing and initiated the action. Finally, the Board investigated the Plaintiffs, and such investigation culminated in the filing of charges.  Thus, this case presents one of the three circumstances in which *Younger* applies, and the Court will now consider the *Middlesex* factors.

### a.  Ongoing State Judicial Proceeding

The Defendants assert that the Board hearing is an ongoing state judicial proceeding. The Plaintiffs contend that there is "nothing 'judicial'" about the Board hearing because, for example, the Board has refused to produce certain information despite the Plaintiffs' numerous requests.  But the proper inquiry is whether the proceeding is judicial versus legislative in nature.  As the Supreme Court explained:

> A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist.  That is its purpose and end.  Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.

*NOPSI*, 491 U.S. 370–71 (quoting *Prentis v. Atl. Coast Line Co.*, 221 U.S. 210, 226 (1908)).  The Board hearing does not seek to "change[] existing conditions by making a new rule"; rather, it seeks to declare and enforce the Plaintiffs' legal responsibilities under existing laws and regulations based on their alleged past actions.  Thus, the Court concludes that the Board hearing is an ongoing state judicial proceeding, and the first *Middlesex* factor weighs in favor of *Younger* abstention.

### b.  Important State Interests

The Court now turns to the second *Middlesex* factor—whether the proceedings implicate an important state interest.  "Proceedings necessary for the vindication of important state policies . . . evidence the state's substantial interest in the litigation." *Middlesex*, 457 U.S. at 432.  The Defendants contend that the Board hearing implicates important state interests because it seeks to enforce statutes regulating the behavior of

23

Alabama pharmacists and pharmacies; preventing pharmacists and pharmacies from undermining public health, safety, and welfare; and protecting the public.  The Court agrees and finds that the State has an important interest in regulating the conduct of the pharmacists and pharmacies it licenses. *See id.* at 434 (finding that New Jersey had an important interest in regulating the conduct of its attorneys).  One of the goals of such control is to protect the public, and the public has an interest in maintaining and enforcing safety and professional standards of conduct of the pharmacies and pharmacists who practice. *See id.* (reaching similar conclusion regarding attorneys).  Indeed, the Alabama Legislature has expressly declared that "[t]he practice of pharmacy and the management and operation of pharmacies . . . affect[s] the public health, safety, and welfare of the people of Alabama." Ala. Code § 34-23-2.

The Plaintiffs do not argue that regulating pharmacists and pharmacies, protecting the public, or protecting public health, safety, and welfare are not important state interests.  Rather, they contend that the State has no important interest in "aiding and abetting the defendants' illegal and unconstitutional actions." (Doc. 47 at 13).  This position misunderstands the nature of the state interest inquiry and also assumes the merits of the argument that the Board proceedings are illegal.  The Court finds that the Board hearing implicates important state interests, and thus the second *Middlesex* factor weighs in favor of *Younger* abstention.

*c.  Adequate Opportunity to Raise Constitutional Challenges*

Finally, the Defendants contend that the Plaintiffs have an adequate opportunity to raise constitutional challenges in the state proceedings.  The Plaintiffs bear the burden of showing that the state proceedings *do not* provide an adequate opportunity. *See Butler v. Ala. Jud. Inquiry Comm'n*, 245 F.3d 1257, 1262 (11th Cir. 2001).  It does not matter whether the constitutional claims are likely to succeed on the merits in state court. *Pompey v. Broward Cnty.*, 95 F.3d 1543, 1551 (11th Cir. 1996).  "Instead, what matters is whether the plaintiff is *procedurally* prevented from raising his constitutional claims in the state courts, from which a certiorari petition can be filed seeking review on the merits in the United States Supreme Court." *Id.*; *see also Moore v. Sims*, 442 U.S. 415, 425–26 (1979) ("[A]bstention is appropriate unless state law clearly bars the interposition of the constitutional claims.").  "[I]it is sufficient under *Middlesex* that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986).

The Alabama Administrative Procedure Act ("AAPA") provides that a person "who is aggrieved by a final [agency] decision is entitled to judicial review." Ala. Code § 41-22-20(a).  The AAPA also authorizes state courts to reverse or modify an agency's decision "if substantial rights of the petitioner have been prejudiced" because, among other reasons, the decision violates constitutional or statutory provisions or is in excess of the agency's statutory authority. *See id.* § 41-22-20(k).  Under *Middlesex* and its progeny, this is sufficient to establish an adequate opportunity to raise constitutional challenges. The

Plaintiffs appear to argue that the existence of state court review, as opposed to the ability to raise constitutional claims in the administrative proceedings themselves, does not merit abstention; however, this argument is unavailing in light of *Ohio Civil Rights Commission*.[9] Additionally, although the Plaintiffs complain that the "limited and deferential" review provided in the AAPA will offer them no relief, the Plaintiffs read the AAPA too narrowly. Under the AAPA, "the agency order shall be taken as *prima facie* just and reasonable," *id.* (emphasis added), not absolutely or irrefutably just and reasonable.  Moreover, while the AAPA states that "the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," *id.*, the AAPA contains no such deferential language regarding questions of law.  The Plaintiffs also suggest that the hearing officer will improperly limit the record, which in turn will limit and adversely impact the state court's review.[10]  But under the AAPA, the reviewing court may receive additional evidence "as to fraud or misconduct of some person engaged in the administration of the agency or procedural irregularities before the agency not shown in the record." *Id.* § 41-

---

[9] Additionally, it appears to the Court that the Plaintiffs can and did raise constitutional claims in the administrative proceeding.  In their answers denying the charges, the Plaintiffs raised PREP Act preemption and immunity as affirmative defenses. (Doc. 45-26 at 8; doc. 45-27 at 8; doc. 45-29 at 4; doc. 45-30 at 4). Although the Plaintiffs did not specifically raise due process, the Commerce Clause, equal protection, or predatory/retaliatory enforcement as affirmative defenses, the Plaintiffs do not suggest that they were procedurally barred from doing so.  Moreover, their answers state that they reserved, and did not waive, all of their rights and defenses. (Doc. 45-26 at 6; doc. 45-27 at 6; doc. 45-29 at 3; doc. 45-30 at 3).  Thus, even assuming that the Plaintiffs' argument is correct, it does not appear that the Plaintiffs are procedurally prevented from raising their federal claims in the administrative proceeding.

[10] Although the Plaintiffs' concerns regarding the hearing officer are, in the Court's view, based on speculation rather than well-pleaded facts, the Court for the sake of argument will accept the Plaintiffs' premise.

22-20(i).  The Court finds that the Plaintiffs have failed to meet their burden of showing that the state proceedings do not offer an adequate opportunity to raise constitutional claims.  Accordingly, the third *Middlesex* factor weighs in favor of *Younger* abstention.

### d.  Bad Faith Exception

The Plaintiffs additionally argue that, even if the *Middlesex* factors are met, the Court should nonetheless decline to abstain because the "bad faith" exception to *Younger* applies.  This exception is triggered "[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).  The Plaintiffs bear a "'heavy burden' to overcome the bar of *Younger* abstention" and must set forth "more than mere allegations of bad faith or harassment." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997) (citation omitted).

The Plaintiffs do not identify with particularity which of the Defendants' alleged actions demonstrate bad faith.  The Plaintiffs reference their allegations of "parallel and conspiratorial actions" by the Board's members, the Board's investigators, and Mr. Beams, and they argue that the amended complaint "presents a substantive, and unrebutted, record of wrongdoing." (Doc. 47 at 17–18).  The only well-pleaded *factual* allegation suggesting that the Board members themselves may be "biased" is the allegation that "at least two individuals who are believed to be immediately related to Board members sought to be and were voluntarily tested for COVID-19 antibodies at The Drug Store." (Doc. 45 at 67, para.

27

163).[11]   The remaining allegations concern whether Chuck Beams, the person who complained to the Board, or Board investigators (Mr. Malloy, Mr. Wells, and Mr. Delk) were biased.  For example, the Plaintiffs allege that Mr. Beams told Lisa Leonard that EAMC's tests were "the word of God" and that she had not heard the end of "this"; according to the Plaintiffs, these allegations demonstrate that Mr. Beams was biased, had an anticompetitive motive, and contacted the Board regarding the patient complaints in order to eliminate the Plaintiffs as competitors.  The Plaintiffs further allege that Mr. Malloy joined Mr. Beams' anticompetitive scheme as evidenced by their email exchanges, particularly Mr. Malloy's email to Mr. Beams stating: "If all goes the way we plan, then I believe we will stop any further issues from The Drug Store."  Additionally, the Plaintiffs contend that the Board's investigator Mr. Delk bullied and harassed the Plaintiffs when he demanded that the Leonards provide statements regarding the gun incident when he knew that the Leonards had counsel.  Finally, the Plaintiffs allege that Mr. Wells pulled a gun on Lisa Leonard during another investigation in 2005, and they allege that Mr. Wells participated in the investigation that gave rise to the currently pending charges; the Plaintiffs contend that the investigation and charges are the product of Mr. Wells' personal vendetta against them, citing the fact that the Board charged them with falsely telling a third party that Mr. Wells pulled a gun on Mrs. Leonard in 2005.

---

[11] But, as noted above, the amended complaint fails to reveal the specific Board members to whom the Plaintiffs refer in this allegation.

Assuming without deciding that the Plaintiffs have sufficiently alleged that Mr. Beams, Mr. Malloy, Mr. Delk, and Mr. Wells were biased or had an anticompetitive motive (or both), the Plaintiffs have not alleged facts from which the Court could reasonably infer that the Board adopted such bias or anticompetitive motive—or that the Board was even aware of it.[12]   The Plaintiffs argue in briefing that the Board members are "responsible for the actions of the Board's investigators," and the Board members' failure to "rein in any of them" makes the Board members "willingly complicit in the malfeasance being perpetuated." (Doc. 47 at 17).  However, the Plaintiffs cite no authority for this proposition or otherwise explain why the Board members are "responsible" for the investigators' actions.  Moreover, the Plaintiffs fail to explain how the investigators' alleged bias may be imputed to the Board members.  In sum, the Plaintiffs fail to allege facts from which the Court could reasonably infer that *the Board* harbored any bias or anticompetitive motive. Finally, the Plaintiffs do not allege that the charges were brought against them "without hope of obtaining a valid conviction." *Perez*, 401 U.S. at 85.

The Plaintiffs also cite *Gibson v. Berryhill*, 411 U.S. 564 (1973), in support of their argument that abstention would be improper, but *Gibson* does not help them.  In *Gibson*, the Supreme Court reviewed a three-judge district court's conclusions that the Alabama State Board of Optometry "was so biased by prejudgment and pecuniary interest that it

---

[12] For example, the Plaintiffs do not allege that Mr. Beams communicated his alleged ill motive to the Board members or the investigators.  And according to the emails attached to the amended complaint, Mr. Beams told the Board he was contacting the Board because he had received patient complaints and reports that patients were confused and he was concerned about public health and safety.

could not constitutionally conduct hearings looking toward the revocation of appellees'
licenses to practice optometry." *Id.* at 578.  The Court affirmed the district court only on
the ground that the Board was biased by virtue of a pecuniary interest sufficient to merit
disqualification. *Id.* at 579.  The district court had "found as a fact that Lee Optical Co. did
a large business in Alabama, and that if it were forced to suspend operations the individual
members of the Board, along with other private practitioners of optometry, would fall heir
to this business." *Id.* at 571.  The district court had determined:

> [T]he aim of the Board was to revoke the licenses of all optometrists in the
> State who were employed by business corporations such as Lee Optical, and
> that these optometrists accounted for nearly half of all the optometrists
> practicing in Alabama.  Because the Board of Optometry was composed
> solely of optometrists in private practice for their own account, the District
> Court concluded that success in the Board's efforts would possibly redound
> to the personal benefit of members of the Board, sufficiently so that in the
> opinion of the District Court the Board was constitutionally disqualified from
> hearing the charges filed against the appellees.

*Id.* at 578.  The Supreme Court explained that it had "no good reason on this record" to
reverse the district court because the Supreme Court was "remote . . . from the local
realities underlying this case" and because it was likely that the district court had "a firmer
grasp of the facts and of their significance to the issues presented." *Id.* at 579.  This
reasoning demonstrates that *Gibson* does not stand for the proposition that an injunction
against state proceedings must be granted anytime the decisionmakers are alleged to have
some pecuniary interest in the outcome.  Moreover, the facts alleged in this case are
distinguishable from *Gibson*.  Unlike *Gibson*, where the optometry board sought to revoke
the licenses of nearly half of all practicing optometrists, the Board of Pharmacy's

challenged actions are directed only at the Plaintiffs.  And the Board's alleged pecuniary interest is speculative because the Plaintiffs do not even allege that the Board members or their pharmacies administer COVID-19 antibody testing.  This is a far cry from *Gibson*, where the district court had found that if Lee Optical ceased operations, the board members and other private practitioners would "fall heir to this business." *Id.* at 571.  Thus, *Gibson* does not change the Court's analysis.

The Plaintiffs also argue the Defendants' actions are illegal, *ultra vires*, and contrary to the immunity purportedly conferred by the PREP Act, and they suggest that this illegality demonstrates the Board's bad faith.  But cases in which courts apply *Younger* abstention invariably involve claims that the state proceedings are illegal or in contravention of federal law. *See, e.g.*, *Ohio Civil Rights Comm'n*, 477 U.S. at 621–22 (holding that *Younger* abstention was warranted in case where plaintiff claimed that state administrative proceeding violated the First Amendment); *31 Foster Children v. Bush*, 329 F.3d 1255, 1261  (11th Cir. 2003) (holding that district court did not abuse its discretion in abstaining under *Younger* in case where plaintiffs claimed that state proceedings violated several constitutional provisions).  If allegations of illegality or actions contrary to federal law were sufficient, the bad faith exception would swallow the *Younger* rule.  Thus, the Court finds the Plaintiffs' argument unavailing.  Accordingly, the Plaintiffs have failed to allege facts sufficient to demonstrate that the bad faith exception to *Younger* applies.

e. *Extraordinary Circumstances*

The Plaintiffs also suggest that this case presents "extraordinary circumstances" rendering *Younger* abstention inappropriate, citing *Kugler v. Helfant*, 421 U.S. 117 (1975). "Only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process." *Id.* at 124. To qualify as "extraordinary," the circumstances must "create[e] an extraordinarily pressing need for immediate federal equitable relief" and not merely "present[] a highly unusual factual situation." *Id.* at 125. Although *Kugler* referenced state criminal proceedings, the standard applies in the civil context as well. *Moore*, 442 U.S. at 433. In support of their position, the Plaintiffs argue that "[t]here is nothing ordinary about the case at bar." (Doc. 47 at 19) (emphasis omitted). This does not persuade the Court that there exists an "extraordinarily pressing need for immediate federal equitable relief." *See Kugler*, 421 U.S. at 125. The Plaintiffs have failed to show that extraordinary circumstances exist justifying an exception to *Younger*.

f. Ex parte Young

Finally, the Plaintiffs argue that *Younger* abstention is inappropriate because their claims for equitable relief are allowed by *Ex parte Young*. However, *Younger* and *Ex parte Young* are not mutually exclusive; they are distinct doctrines animated by distinct concerns. *Ex parte Young* concerns the federal courts' jurisdiction over certain claims against state officials, whereas *Younger* concerns not jurisdiction but principles of equity and comity. A court can have jurisdiction under *Ex parte Young* but nonetheless conclude that *Younger*

32

abstention is appropriate. *See, e.g.*, *Fairfield Cmty. Clean Up Crew, Inc. v. Hale*, 2017 WL 4865545, at *11 (N.D. Ala. Oct. 27, 2017) (Coogler, J.) ("While the Court does have subject matter jurisdiction under *Ex parte Young* to hear Community's allegations of Defendants' ongoing violations of federal law, it ABSTAINS from doing so under *Younger*."), *aff'd*, 735 F. App'x 602 (11th Cir. 2018) (per curiam).   The Plaintiffs' argument is unavailing.

Because the Board hearing is a civil enforcement proceeding of the type contemplated by the Supreme Court, the *Middlesex* factors are met, and the Plaintiffs have failed to demonstrate that any exception applies, the Court finds that it should abstain under *Younger* from considering the official capacity claims in Counts 1 and 3–6.   Accordingly, the official capacity claims in Counts 1 and 3–6 are due to be dismissed without prejudice.

**B.  Amended Motion for Preliminary Injunction**

The Court also has before it the Plaintiffs' amended motion for preliminary injunction.   To obtain a preliminary injunction, the Plaintiffs must demonstrate, among other prerequisites, that they have a substantial likelihood of success on the merits. *See Brown*, 4 F.4th at 1224.   "Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (per curiam).

In support of their amended motion for preliminary injunction, the Plaintiffs submitted the declaration of Lisa Leonard. (Doc. 54-1).   Her declaration largely attests to the amended complaint's allegations but also asserts additional facts.   For example, Mrs.

Leonard asserts that in February 2021, prior to the Board's issuance of the Statement of Charges, the Board made a "bad faith 'settlement offer'" whose terms included, among other things: a $250,000 fine, suspension of Mrs. Leonard's pharmacy license, suspension of The Drug Store's permit, and a public reprimand of Mrs. Leonard regarding the incident where she accused Mr. Wells of pulling a gun on her at The Drug Store. (*Id.* at 9, para. 26). Mrs. Leonard asserts that if the Plaintiffs accepted the Board's settlement offer, The Drug Store would be forced out of business.  The Defendants object generally to the declaration as being untimely provided, and they object specifically to certain allegations as irrelevant or supplying facts outside the operative complaint.   The Court will assume without deciding that it may consider the entirety of Mrs. Leonard's declaration.  The declaration nonetheless fails to aid the Plaintiffs in demonstrating a substantial likelihood of success on the merits.  To the extent the declaration attests to the amended complaint's allegations, the Court has determined that the amended complaint fails to state a claim upon which relief can be granted or brings claims over which the Court will abstain from exercising jurisdiction; therefore, the Plaintiffs necessarily have also failed to demonstrate a substantial likelihood of success on the merits based on those allegations.  To the extent the declaration asserts additional facts, these facts do not change the Court's opinion that the Plaintiffs' individual capacity and antitrust claims are implausible, nor do they change the Court's opinion that abstaining from the remaining claims is appropriate; therefore, the additional facts fail to aid the Plaintiffs in demonstrating a substantial likelihood of success on the merits.

Additionally, the Defendants submitted the affidavit of Donna Yeatman, the Board's executive secretary. (Doc. 52-1). In the affidavit, Ms. Yeatman describes the procedures by which a disciplinary action before the Board proceeds. The Plaintiffs object to the affidavit on relevancy grounds except for paragraphs 10–13. Even if the Court considered only paragraphs 10–13 of Ms. Yeatman's affidavit, the Court would nonetheless conclude that the affidavit fails to aid the Plaintiffs in demonstrating a substantial likelihood of success on the merits. The Plaintiffs argue these paragraphs, considered with the amended complaint's allegations and Mrs. Leonard's declaration, demonstrate that the Board failed to follow its own procedures with respect to the Plaintiffs, and that these failures demonstrate bias. The Plaintiffs additionally argue the affidavit demonstrates that, to the extent the Board did follow its procedures, the Board knew about and endorsed both the charges and the Board's settlement offer. The Court will assume without deciding that paragraphs 10–13 are the only relevant portions of the affidavit and also that the Board's failure to follow its own procedures demonstrates bias. Nonetheless, this evidence does not change the Court's opinion that the Plaintiffs' individual capacity and antitrust claims are implausible, nor does it change the Court's opinion that abstaining from the remaining claims is appropriate. The evidence still fails to identify actions taken by individual Board members as distinguished from actions taken by the collective Board. Additionally, the evidence does not cure the infirmities with the Plaintiffs' antitrust claim discussed *supra* Part V.A.2. Finally, any bias purportedly revealed by the affidavit is not the type of bias justifying a federal court injunction. *Cf. Gibson*, 411 U.S. at 578–79. Thus,

the Court concludes that the affidavit fails to aid the Plaintiffs in demonstrating a substantial likelihood of success on the merits.

Because some of the Plaintiffs' claims are not plausible and the remaining claims are subject to *Younger* abstention, the Plaintiffs necessarily have failed to demonstrate a substantial likelihood of success on the merits. Neither Mrs. Leonard's declaration nor paragraphs 10–13 of Ms. Yeatman's affidavit, separately or together, change the Court's opinion. Accordingly, because the Plaintiffs have not established a substantial likelihood of success, the Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction. *See Schiavo*, 403 F.3d at 1226.

## VI. CONCLUSION

For the reasons stated above, it is

ORDERED as follows:

1. The Defendants' motion to dismiss (doc. 39) is GRANTED. The claims against the Board members in their individual capacities, as well as the antitrust claim against the Board and its members in their official capacities, are DISMISSED WITH PREJUDICE. The remaining claims against the Board and its members in their official capacities are DISMISSED WITHOUT PREJUDICE;

2. The Plaintiffs' amended motion for preliminary injunction (doc. 33) is DENIED. A separate Final Judgment will enter.

36

Done this 10th day of March, 2022.

                    /s/Emily C. Marks
                  EMILY C. MARKS
                  CHIEF UNITED STATES DISTRICT JUDGE